Linda JOSEPH, Plaintiff,

v.

**PUBLIX SUPER MARKETS, INC., a Florida corporation, Defendant.**

No. 96–152–CIV.

United States District Court, S.D. Florida.

Aug. 29, 1997.

Michael B. Feiler, High Stack Lazenby, et al., Coral Gables, FL, Angela Marie Nixon, Kaplan & Bloom, Coral Gables, FL, for Plaintiff.

John Edward Ailey, James Morgan Craig, Alley & Alley, Tampa, FL, for Defendant.

### ORDER GRANTING DEFENDANT, PUBLIX SUPERMARKETS' INC. MOTION FOR SUMMARY JUDGMENT. (D.E.# 21)

ATKINS, Senior District Judge.

THIS CAUSE comes before the court on Defendant, Publix Super Market's Inc., (Publix) motion for summary judgment against Plaintiff, Linda Joseph (Joseph). After review of the motion, response, reply, including memoranda of law on both sides, and with a full understanding of all underlying facts and applicable laws,, it is,

ORDERED AND ADJUDGED:

(1) Defendant Publix's *Motion for Summary Judgment,* is **GRANTED**;

(2) This case is hereby **CLOSED** and all pending motions are hereby **DENIED AS MOOT.**

### *Statement of Facts*

Although Ms. Joseph worked for Publix, off and on for three (3) years prior to the events at issue here, all issues in this case occurred after her transfer to Store # 80 in March 1992. It was at Store # 80 that Ms. Joseph claims she was discriminated against and harassed by Publix.

In essence, Ms. Joseph's claims of discrimination take three forms. First, she alleges she was subjected to offensive comments by her manager in the Bakery Department. These offensive comments, detailed below, form the basis of Ms. Joseph's hostile work environment claims, and relate to discrimination on the basis of race and/or national origin. Ms. Joseph's second set of claims in support of her discrimination suit surround her attempts to enter into Publix's management trainee program. In particular, Ms. Joseph claims that after entering the trainee program, she was subjected to unfair practices and/or treatment by Publix managers in an attempt to scuttle her management aspirations. According to Ms. Joseph, Publix managers acted with discriminatory intent in their handling of her training, and ultimate removal from the management track.

Finally, Ms. Joseph alleges illegal retaliation, also in violation of Title VII, as a result of her decision to report the allegedly discriminatory conditions at Store # 80, to the EEOC in June 1995. According to the allegations of the Complaint:

> Following Plaintiff's termination from Store # 80, she was transferred to a bakery clerk position at Publix store # 153. Since the Plaintiff's filing of the EEOC charge of discrimination herein, the Plaintiff has been subjected to a hostile and retaliatory atmosphere at Store # 153 in that she has been closely scrutinized, harassed, and unjustly disciplined while employed at this store.

*Complaint,* ¶ 8 at p. 3. Plaintiff has brought forward no evidence in support of this allegation.

### *Claims of Discrimination due to offensive comments:*

In October 1993, Publix hired Mr. Dennis "Chip" Lee, (Lee) as the Bakery Manager for Store # 80. Lee had the authority to issue performance evaluations and discipline associates working under him. Joseph described her initial acquaintance with Lee as a "normal relationship". (Joseph at 149). However, over time, Joseph alleges Lee began to harass her with numerous racial and/or ethnic comments. The offensive remarks include:

- "I'll fire you so quick your head will be spinning and you'll think you're back in Africa."
- "If you like Africa so much, why don't you just go back to Africa."
- "If you're so pro-black, why (sic) your boyfriend looks white?"
- "I don't know why we are sending our kids or our people to help them. Why can't you

guys fight your own battles or fight your own fight?" (Lee's alleged comment regarding American troops in Haiti.)

- "I was supposed to be a cop and they dropped my class because there was not enough blacks in the class. Just because you're black you get 20 points." (Lee's alleged comment regarding his application for the Metro–Dade and Coral Gables police departments.)
- "The only reason [you] got into management is because [you are] a black woman." (Lee's alleged comment regarding Joseph's promotion to full-time status)
- "If they don't accept his daughter, he will sue the hell out of the pageant." (Lee's alleged comment regarding an African American beauty pageant.)
- "The United Negro College Fund was made only for black people and that's reverse discrimination."
- "Corretta Scott King opened a museum, not to keep his memory alive or keep his dream alive, [it's] just to make money."
- "You people." (Lee's alleged comment referring to African Americans)
- "For what? All you guys do is cause trouble at (sic) them parades" (Lee's alleged comment after Joseph asked for time off to attend the Martin Luther King Jr. day parade.)
- "She was too lazy to get up from the bus. She didn't want to make a civil rights movement. She didn't want to . . . make a stand. She was just too lazy to get up." (Lee's alleged comment regarding Rosa Parks.)

These remarks, made (according to Plaintiff's testimony) between March 1994 and May 1995, form the basis for Joseph's claims she endured a hostile or abusive working environment while at Store # 80. *See infra* pgs. 1437–1438. No other incidents, comments or examples have been brought forward by Plaintiff in support of this aspect of her claim.

### Discrimination in management trainee program:

In February 1994, Joseph informed Publix's then District Manager, Bob Resciniti (Resciniti) and then Store Manager, John Kori (Kori), about her interest in pursuing a career in management at Publix; specifically, the position of second assistant store manager. Joseph was advised by both Resciniti and Kori that in order to advance into management she would have to become a full-time employee, maintain a flexible schedule and learn how to stock store shelves. Under Publix's policy, a certain succession of positions must be held prior to entering into management:

> [A]n associate must have substantial experience as a Stocker as a condition of entry into Grocery Management. To obtain the requisite stocking experience, an associate must work in some combination of the five job classifications which involve stock: Grocery Clerk, Dairy Clerk, Frozen Food Clerk, Health and Beauty Care Clerk, and Housewares Clerk. To obtain a sufficient background in stock work and merchandising, an associate must have six months full-time experience stocking in the Grocery Department, including both dry grocery and perishable experience.

(Publix Policies and Procedures on Promotion in Retail Stores at 6.)

As a result of Joseph's request to enter management, she was placed on full-time status. However, no stock positions were available at the time, and Ms. Joseph floated between positions in the Bakery Department and front service (cashier).

For the next four (4) months, Joseph continued to press Kori (the Store Manager) to place her into a stock position, only to be told no positions were available. In June 1994, Kori was replaced as Store Manager by Brian Aten. Soon thereafter, Joseph approached Aten to tell him of her desire to enter management, and the need to obtain a stocker position to reach that goal. Aten also informed Joseph no position was currently available, but assured her she would receive the first available position. As a result, in August 1994, Aten "created"[1] a stocker position for Ms. Joseph to fill, which she did in August 1994.

---

1. According to Aten, he decided to reassign stocking duties among the current clerks, which created an opening for Ms. Joseph.

The responsibilities of a stock clerk include, *inter alia*, ordering merchandise from the warehouse, managing the back stock until it is ready for the shelves, moving the merchandise from the stockroom to the shelves, placing the merchandise on the shelves, ensuring the proper tags are on the shelves, and promptly replacing missing tags with temporary handwritten ones. According to Resciniti, the approximate training time [2] for a new stock clerk could range from several weeks to several months. (Resciniti Decl. pg 32.)

When Joseph began the stock clerk position, she was assigned to the cereal aisle. On or about September 9, 1994, Joseph received written counseling regarding her alleged poor job performance for refusing to order Kelloggs Corn Flakes and failing to make a shelf tag for it. However, Joseph alleges that she had in fact made two tags, which Aten himself tore down because they were not done correctly. Additionally, on September 15, 1996, Joseph was counseled for failure to stock the shelves in the cereal aisle by 6:00 a.m. She was advised that if her performance did not improve she would be transferred to another position. Two weeks later, Joseph was removed from the stock-clerk position. After hearing of her removal from stock clerk, Joseph requested time off to pursue other options.[3]

Following her removal from stock-clerk, in November 1994, she returned to store #80 in the bakery department. Joseph admits her attitude after November 1994 had soured and she experienced many problems at the bakery.

From November until April 1995, Joseph was continually involved in conflicts. She received written and oral reprimands for allowing store employees to eat in the back room of the bakery. She was involved in two instances where a white bakery employee was accused of refusing to serve black customers. Management at Store #80, apparently went so far as to accuse Ms. Joseph of setting up one incident where a black customer was refused service.

Finally, on or about April 30, 1995, Joseph's store manager, Aten, after hearing (through others) that Joseph was making insubordinate comments about store management, called her in for a meeting.[4] The meeting degenerated in an argument between Joseph and Aten. Two days later a mandatory meeting for all bakery associates was held. Although the meeting was intended to address general problems in the bakery, Joseph alleges it deteriorated into an attack against her by many associates in the department. According to Joseph's testimony, Aten urged the other employees in the bakery department to raise concerns about Ms. Joseph—which they did.

From the evidence, Joseph did not take the comments well.[5] As a result of the meeting, it was decided that Joseph would be transferred to another department. She was initially placed in the deli department. However, Joseph presented a doctor's note stating the smell of the meat made her nauseous. She was then offered a position as a package clerk, sometimes referred to as "bag boy". Joseph complained to Aten and then District Manager Suarez (Suarez) about the unfairness of the package clerk assignment but was told, if she did not take the package position she would no longer be employed at Publix. Joseph declined the position and requested

---

**2.** What is not clear is whether Mr. Resciniti was referring to the actual time an individual is "trained" (i.e. with a supervisor on hand to assist) or the amount of time it takes for an individual to master all the tasks of stocking. Although it seems to the Court that Mr. Resciniti was speaking of the latter, for purposes of this motion, the Court accepts Ms. Joseph's position that Publix had a general policy of training grocery stock clerks for a period of several weeks to several months.

**3.** Although Ms. Joseph's personnel records indicate she requested time off to take care of matters concerning school, the evidence is clear and uncontested she took leave to pursue other em-

ployment options, either working at Publix or another employer.

**4.** Aten alleges that Joseph made inappropriate comments to another bakery clerk. These comments include: "everyone is scared of her [Joseph]"; "nobody can fire her"; "when she wanted full-time she demanded it and got it, plus a raise"; "she has been written up she refused to sign it and ripped it up". Joseph disputes these comments.

**5.** According to the record, Joseph apparently lashed out against the other employees, and was generally displeased with her belief they were singling her out.

time off—which was granted. Shortly thereafter she was offered a transfer to Store No. 153 for an available bakery clerk position—which she accepted and held for approximately 10 months before finally leaving Publix's employ to go work for WalGreens.[6]

### Ms. Joseph's Complaints to Reggie Brown

In support of her allegations, Ms. Joseph claims she notified Publix on two (2) occasions of Lee's harassing conduct. In both instances the individual who took her complaints was Reggie Brown. Brown is a climate assessment[7] specialist, employed by Publix. His duties include visits to various Publix supermarkets where he conducts climate assessment surveys. These surveys consist, as it appears to this Court, of handouts for employees to voice *any* concerns, complaints, compliments or other suggestions they may have about the store. Mr. Brown compiles those surveys, and presents the results to the store in the form of a report. Mr. Brown does not have authority to act on the complaints of employees, nor does he attempt to interpret the results of the surveys other than to report the results to store management.

It was at one of these climate assessment meetings, at store #80 in March 1994, that Ms. Joseph claims she gave her first notice to Publix of Lee's harassment. After presenting the results of the climate assessment survey to Store #80, Ms. Joseph approached Brown and asked to see him in private. According to Joseph, "Although I cannot remember exactly what I told Mr. Brown during this conversation, I did indicate to him that I felt my Bakery Manager Chip Lee was a racist." *Joseph Affidavit* at 1. At her deposition, Joseph merely remembers saying she felt she was being discriminated against by her bakery manager.

Brown testifies that Joseph voiced her frustrations about not moving into management quickly enough, and that she felt the

racism of her bakery manager played a part. In response, Brown counseled Ms. Joseph to "express her career opportunities or goals as she would like with the company with the management and then go from there." As well, Brown remembers saying "I told her if she needed me or ever had any, I guess, things for me to do to try to help her, that I would[,] to call me." *Brown Depo.*, at 76. Brown never mentioned the meeting to anyone else at Publix, and Ms. Joseph did not follow up with a phone call or a meeting with her store managers. As well, according to Ms. Joseph's testimony, all of the comments she claims Lee made to harass her occurred *after* her meeting with Brown.

The second notice came over one year later on May 1, 1995. On that day, following an earlier shouting match between Joseph, Lee and the Store Manager Brian Aten, Ms. Joseph called Reggie Brown. Joseph testified she called Brown specifically because of his earlier promise to help her if a problem arose. *Joseph Depo.* at 173. According to Ms. Joseph, she called Brown because "I wanted to give, I wanted—because I was so upset at this time but I wanted corporate level to know what Chip was doing and Mr. Aten was doing." *Id.* During her phone call to Mr. Brown, she referenced one (1) comment allegedly made by Lee—the "head spinning" remark detailed above. Brown, on hearing that allegation responded, according to Joseph, "Wait a minute. We definitely need to get Human Resources involved in this." *Id.* at 174.

Brown's recollection of events corresponds closely with Joseph's. In fact, Brown took detailed notes during the conversation with Joseph, writing them from her perspective. Relevant excerpts of the notes, dated May 1, 1995—9:15–9:55 a.m. are as follows:

Mr. Brown you said, if there was a time that I needed you to please give you a call. So, this morning I'm taking you up on your offer. I really don't know when it all began.

---

**6.** According to Ms. Joseph's testimony, her job at WalGreens paid substantially more than at Publix, and was a management position . . .

**7.** Brown conducted a climate assessment test of Publix Store No.80. Climate assessment surveys are conducted both on a random basis and upon a specific request by a District Manager or Re-

gional Vice President. The results of the survey done at Store No. 80 were reported in categories labeled, "Dissatisfiers", "Satisfiers" and "Suggestion for Improvement." The breakdown of the report indicates that eight (8) "Dissatisfier" complaints fell into a subcategory of "discrimination."

(Ms. Joseph then details verbal abuse—non-racial in character—by Brian Aten.) My bakery manager (Brain Lee) [*sic*] is the most lyingness, [sic] gasping, [sic] [gossiping], manipulator I have ever come in contact with. He'll ·do anything to get what he wants done. We have a big problem with gasp [*sic*] [gossip] in our department and he is the main source.

(Ms. Joseph then details events surrounding another manager, Ms. Maria Beranek who she claims is also racist.)

Chip has made the comment to me, "Don't think that no one can get fired form [sic] Publix." I responded how can they if they are doing their job? He said, "We'll find a way to do it." And, don't even think about calling your big buddy's [*sic*] in Lakeland. They're not going to do anything but call me. He told me to my face in front of other bakery associates, "The only reason you are full-time is because you are a black woman. But I'll fire you so fast, your head will be spending [sic] [spinning] and you'll think you are in Africa. Reggie, I can't take it anymore, please is their [sic] anyone that can help me.[?]

From this conversation, Reggie Brown typed up a report and passed it to Curtis Palmore, a human resource specialist and the individual responsible for investigating claims such as Ms. Joseph's. Mr. Palmore then passed the report to Jose Tomas who initiated an investigation.

Ms. Joseph also sent a letter to Mr. Palmore complaining of mistreatment at Store # 80. . Interestingly, the letter contains no allegations of racial slurs or comments directed at her by Mr. Lee.

Joseph's complaint was investigated by Jose Tomas (Tomas), Human Resources Investigator. In the end, Tomas instructed Lee to refrain from making further inflammatory or discriminatory comments. However, Lee was neither discharged, transferred, or otherwise publicly disciplined.[8]

**Complaint to the EEOC**

Soon after transferring to Store # 153, Ms. Joseph filed a complaint, alleging racial, na-

tional origin and sexual harassment while at Store # 80. The complaint, filed June 9, 1995, was reviewed by the EEOC, and a right to sue letter was issued on October 26, 1995. As a result of the filing of the complaint with the EEOC, and the later instigation of this lawsuit in January 1996, Ms. Joseph claims, according to the bare allegations of the Complaint in this case, she has been the subject of illegal retaliation in that she has "been closely scrutinized, harassed, and unjustly disciplined while employed" at Store # 153.

Joseph has now filed this suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e—2000e–17 and 42 U.S.C. § 1981, alleging discrimination based on race, sex and national origin and retaliation. In the end, Ms. Joseph pursues various theories in her attempt to recover damages for the felt discrimination at the hands of Publix. Specifically, Joseph claims: (1) that she was constructively discharged for discriminatory reasons when she was demoted from stock clerk to bag boy; (2) that her treatment at the hands of Chip Lee created a hostile work environment; (3) that she was unlawfully discriminated against in her pursuit of a management career as evidenced by her treatment as a stock clerk; and (4) that she was subjected to unlawful retaliation while at Store # 153 (after leaving Store # 80) for her filing of a discrimination claim with the EEOC.

In response to these allegations, Publix has filed this summary judgment motion. The motion is now ripe and ready for adjudication.

### Analysis

**I. DEFENDANT, PUBLIX, IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIMS UNDER TITLE VII AND 42 U.S.C. § 1981, BECAUSE PLAINTIFF NEVER RESIGNED.**

 Ms. Joseph's first claim for recovery against Publix lies in her allegation she

---

8. Joseph alleges that she was never informed of Lee's counseling nor of the results of the investigation. However, she does recollect being approached by Mr. Tomas as part of the investigation of the incident.

was constructively discharged for a discriminatory purpose. Although it is true Title VII forbids an employer "to ... discharge any individual ... because of such individual's race, color ... sex or national origin;" 42 U.S.C.A. § 2000e–2(a)(1), the circumstances of this case prevent Ms. Joseph from claiming a constructive discharge.

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary *resignation,* then the employer has encompassed a constructive discharge and is liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975) (emphasis added).[9] *See also Buckley v. Hosp. Corp. of America,* 758 F.2d 1525 (11th Cir. 1985). The imposition of liability against a rogue employer is explicitly predicated on a finding the aggrieved employer was *"forced into an involuntary resignation." Id.* Thus, in order to establish a prima facie case of constructive discharge the Plaintiff must show that he/she has left employment. *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34 (1st Cir.1993) (holding that employee's constructive discharge claim failed where he did not leave his employment).

Although Joseph contends that "the facts in this case clearly demonstrate that [her] working conditions at Store no. 80 were sufficiently difficult or unpleasant to cause a reasonable person in her shoes to resign" she in fact never resigned. (Plaintiff Response at 4). For any Plaintiff to be successful on a constructive discharge claim, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1538 (11th Cir.1987) *quoting Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d

61, 65 (5th Cir.1980). Given this well accepted understanding of what constitutes a prima facie case of constructive discharge, the Court has little difficulty finding Ms. Joseph's claim deficient. Specifically, a successful claim for constructive discharge must contain an element of *discharge.* In other words, a Plaintiff must leave her employ.

It is illogical to find a "reasonable person" could not continue working at the job in question, and then find that Ms. Joseph in fact was able to continue working for Publix for 10 months after. In the end, to the extent cases concerning the elements for finding constructive discharge have not heretofore *explicitly* stated an essential element to be that Plaintiff must actually leave her work—this Court has little difficulty adding that element to an examination of these claims. Since Ms. Joseph did not leave Publix's employ until 10 months after the incidents which she claims gave rise to her discharge, the Court dismisses this claim and *GRANTS* Defendant's motion on this issue.[10]

## II. DEFENDANT, PUBLIX IS ENTITLED TO SUMMARY JUDGMENT AS TO JOSEPH'S HOSTILE ENVIRONMENT CLAIM, WHERE JOSEPH CANNOT ESTABLISH RESPONDEAT SUPERIOR OR DIRECT LIABILITY

As another theory for recovery under Title VII, Ms. Joseph claims she was subjected to a hostile work environment. The elements for showing a claim of hostile work environment, although generally found in sexual harassment cases, are well known:

> (1) she belongs to a protected class; (2) she was subjected to unwelcome ... harassment; (3) the harassment was based on her protected status; (4) the harassment affected a term, condition or privi-

9. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decision of the former Fifth Circuit rendered prior to October 1, 1981.

10. As a result of the uncontroverted fact Ms. Joseph did not leave Publix's employ until well

after the incident in question, the Court need not look into the particular circumstances surrounding Ms. Joseph's demotion. Thus, the implications of *Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432 (11th Cir.1997), need not be considered.

lege of employment; and (5) respondeat superior.

*Robertson v. Alabama Dept. of Econ. and Comm. Affairs,* 902 F.Supp. 1473 (M.D.Ala. 1995) *citing Henson v. Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982).

■ Ms. Joseph, as a black woman of Haitian descent, is a member of several protected classes. As well, Chip Lee's comments, chronicled above, relate directly to her protected status. Mr. Lee repeatedly made offensive comments to Ms. Joseph that referred to her country of origin (Haiti) and her race. However, no examples of *any* harassment have been produced to show Mr. Lee or any other employee of Publix ever made harassing comments to Ms. Joseph based on her gender. As a result, Ms. Joseph's claims for hostile work environment based on her gender are unsupported in the record, and will not be discussed further.

■ Elements (1) & (3) are clearly met in this case. Element #2, the requirement that the harassment was "unwelcome" requires some quick discussion. As articulated by the Supreme Court, "so long as the environment would reasonably be perceived, and is perceived, as hostile or abusive ...", Title VII is violated. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). In this case, some evidence has been presented by Defendant that Ms. Joseph did not find Lee's comments offensive or hostile. The testimony of Chip Lee, and another co-worker of Ms. Joseph, a Ms. Debbie Self, point to the fact that any racial comments made by Lee were during the course of friendly, albeit highly charged, political discussions. According to Ms. Self, Ms. Joseph "had come in on her days off just to talk with Chip Lee about Farrakan and anything political having to do with black and white.... They would laugh and argue and they would laugh at each other. And there was—I don't believe she really believed he was a racist at all." *Self Depo.* at 13–14.

■ It is true that "mere utterance of an ... epithet which engenders offensive feelings in an employee" does not constitute a hostile work environment. *Meritor,* at 67,

106 S.Ct. at 2405–06. However, in this case the issue before the Court is whether; in the context of a motion for summary judgment, could the working situation at Store #80 be considered by a reasonable person to create a hostile working environment.

■ Mr. Lee's alleged comments, taken as a whole, might according to a reasonable person rise to the level of a hostile working environment.

When the workplace is permeated with "discriminatory intimidation, ridicule, and insult, that is "sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment" Title VII is violated. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citations omitted) *quoting and citing Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Ms. Joseph found her working environment sufficiently unpleasant to report it to higher management in May 1995. As well, on at least two occasions, Ms. Joseph became so upset at work she suffered bouts of crying and emotional distress. Although much question remains whether Ms. Joseph's treatment at Publix was motivated by a discriminatory purpose by her managers, in the context of this motion the Court finds evidence has been put forward to support a finding that a reasonable person would find the working conditions at Store #80 were sufficiently unpleasant as to be hostile. As well, the Court finds Ms. Joseph found them subjectively hostile, and suffered a concomitant alteration of her working conditions as a result of her perception.[11] Therefore, the Court finds Ms. Joseph's claims satisfy the first four (4) elements described above.

■ The fifth (5) and last element, "respondeat superior", is related to the principle that "employers are not automatically liable for hostile work environment ... harassment by their supervisors." *Faragher v. City of Boca Raton,* 111 F.3d 1530, 1536 (11th Cir.1997). In this Circuit, the liability

---

11. Again, the Court emphasizes these findings only relate to this motion. As mentioned at various points throughout this order, the Court has serious doubts that Ms. Joseph's disclosed evidence will prove legally sufficient to withstand a motion for judgment as a matter of law, on any of these claims were they to proceed to trial.

of an employer may only be established in one of two ways. First, "an employer may be held indirectly, or vicariously liable for hostile environment ... harassment: (1) when a harasser is acting within the scope of his employment in perpetrating the harassment, and (2) when a harasser is acting outside the scope of his employment but is aided in accomplishing the harassment by the existence of the agency relationship." *Id.* (footnotes and citations omitted). Second, an employer may be "directly liable for hostile environment ... harassment if it knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action." *Id.* at 1535. *See generally Reynolds v. CSX Transp., Inc.,* 115 F.3d 860 (11th Cir.1997); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900 (11th Cir.1988).

**a. Indirect Liability:** Although the issue of Publix's indirect liability has been largely ignored by the parties, a review of current caselaw makes clear Publix cannot be held liable under this theory. To be indirectly liable, the harassment must be "accomplished by an instrumentality of the agency or through conduct associated with the agency status." *Faragher,* at 1538. The Eleventh Circuit recently ruled that "in a pure hostile environment case, a supervisor's harassing conduct is typically outside the scope of his employment." *Id.* at 1535 (citing *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989)). "If the agent has no intention to perform any service for his employer, but instead seeks only to further some personal end, then the act is not within the scope of his employment." *Id.* at 1536. In this case, absolutely no evidence or argument has been produced to show that Chip Lee harassed Joseph "in order to perform any service for [Publix] or that [he] was either explicitly or implicitly authorized by [Publix] to engage in such harassment." *Id.* at 1537. As a result, this theory of recovery is untenable.

This is also a failure of evidence to show Lee was aided in accomplishing the harassment by the existence of his agency relationship with Publix. Again, the Court is guided by the recent decision in *Faragher.*

In one sense, a supervisor is always aided in accomplishing hostile environment [race or national origin] harassment by the existence of an agency relationship with his employer because his responsibilities include close and regular contact with the victim. However, the common law rule does not use "aided" in such a broad sense. Rather, the employer is liable only if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status.

*Id.* In cases outside the sexual harassment arena, it seems to this Court that liability under this theory is very hard to articulate. Nonetheless, in this instance, it is clear to the Court that Lee did not use his agency relationship to further his harassment. He took no adverse employment actions against Joseph. Indeed, the evidence is clear that Ms. Joseph enjoyed relative professional success for much of the time Lee's harassment is alleged to have occurred. She remained full time, she was given a stock position, and, when her forays into the management trainee program failed, she returned to a full-time position in the bakery department. As well, Ms. Joseph has not alleged Lee's comments worked in any way to chill her management aspirations.

In the end, Ms. Joseph has failed to make a *prima facie* case of Publix's indirect liability for any alleged harassment suffered at the hands of Mr. Lee. As a result, Publix cannot be held liable under this theory.

**b. Direct Liability:** As noted above, Publix is directly liable if it knew or should have known of the harassment and failed to take prompt remedial action. The initial question to answer is—did Publix know of the harassment?

"The employee can show that the employer had knowledge of the harassment by proving that she complained to higher management of the problem or by demonstrating that the harassment was so pervasive that an inference of constructive knowledge arises." *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir. 1988). *See also Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752 (11th

Cir.1996). In this case, Ms. Joseph alleges she gave explicit notice to Publix of Chip Lee's harassment on two separate occasions. On both occasions, notice to Publix was accomplished through the conversations with Mr. Reggie Brown detailed earlier.

■ As to the initial meeting, in March 1994, the Court finds that, as a matter of law, it cannot constitute notice to Publix of the hostile work environment which Ms. Joseph claims existed. This is so for two reasons. First, Brown is not the appropriate individual to report instances of harassment, and does not constitute higher management. Second, even if Brown was higher management, by Joseph's own testimony, her conversation of March 1994 did not contain any allegations of harassment by Lee, and by Joseph's own admissions, Lee's harassment did not *begin* until *after* she talked to Brown.

According to Brown, "I told her—the best thing that I could tell her is to express her career opportunities or goals as she would like with the company with the management, and then go from there.... I told her if she needed me or ever had any, I guess, things for me to do to try to help her, that I would, to call me." *Brown Depo.* at 75–6. On hearing of Joseph's concerns, Brown specifically directed her to talk to management, and then clearly informed her he intended to take no action unless she called him.

Thus, Joseph was aware her "complaint" of March 1994, would not receive further attention unless she contacted Reggie Brown again. Further, even if she had intended for Reggie Brown to conduct further investigation, that investigation would not have looked into any alleged harassment because, as yet, no harassment had occurred. As a result, it is impossible to find the conversation between Ms. Joseph and Reggie Brown constitutes, under any view of the facts, notice to "higher management."

As to Joseph's phone call to Brown of May 1, 1995, Publix admits this constitutes notice. Ms. Joseph clearly detailed in an instance of inappropriate and offensive conduct by Chip Lee. Brown immediately notified his superiors of the comment, and an investigation was begun. As a result of the investigation, Chip Lee was counseled, although never publicly reprimanded. The question still remains whether the investigation, initiated immediately after the May 1, 1995 call, constitutes "prompt and remedial action" necessary to shield Publix from liability for Lee's harassment.

■ "Whether an employer takes appropriate remedial action, under Title VII ... upon learning of hostile environment, depends on particular facts of case, including severity and persistence of harassment, and effectiveness of any initial steps." *Reynolds v. CSX Transp., Inc.,* 115 F.3d 860 (11th Cir.1997) *quoting Garcia v. Elf Atochem N. Am.,* 28 F.3d 446, 451 (5th Cir.1994). In this case, under all the circumstances as revealed to the Court, it is impossible to find that Publix's response to the complaint was neither prompt nor remedial. The evidence is uncontroverted Publix immediately acted on Joseph's complaint. Further, in a case like this, where the alleged offender after being counseled never again harasses the employee "a reasonable juror could not find" that Publix's actions, including immediate investigation and oral reprimand, "did not constitute prompt action 'reasonably likely to prevent the misconduct from recurring.'" *Reynolds,* 115 F.3d at 868.

Prior to the call of May 1, 1995, Publix had no direct knowledge of Lee's harassment of Joseph. As soon as Lee's comments were brought to the attention of higher management, Publix investigated the incident, and counseled Lee. No further comments were ever made by Lee. As a result, the Court finds that when Publix was made aware of the alleged harassment, prompt remedial action was taken.

■ The final issue raised is Joseph's allegations that Publix *should* have known of the harassment prior to May 1, 1995, thereby holding Publix liable under a theory of constructive knowledge. The basis of Joseph's allegations rest, almost entirely, on one argument. Joseph argues the climate assessment survey of March 1994, which contained specific complaints about the bakery department, constitutes evidence of the pervasive nature of Lee's harassment and should therefore serve to create constructive knowledge of the hostile work environment engendered by Chip Lee.

According to Joseph, the following complaints contained in the climate assessment survey are sufficient to assert Publix's constructive knowledge.

1. "The slogan 'where working is a pleasure' would be correct if Publix treated their minority employees in the same manner as other employees."

2. "promote more black women … we are able and willing if we were just given the opportunity."

3. "I don't like being treated unfairly as the result of my race. Whites seem to be promoted twice as fast despite not having a high school diploma."

4. "Stop treating employees like dirt … without us you would not be in business. Please investigate our store, especially the bakery, because we have many problems."

On reading the above comments, it is impossible for the Court to see how these vague and general complaints, interspersed throughout the survey with comments bemoaning the mistreatment of white employees compared to minorities,[12] can constitute constructive knowledge of Chip Lee's harassment of Joseph. None of the comments talks of harassment in any sense. In the end, the Court finds no reasonable juror, confronted with nothing more than these vague complaints, could find the harassment at Store # 80 so pervasive that Publix should have known of Lee's harassment prior to Joseph's complaint of May 1, 1995. *See Faragher, supra; Reynolds v. CSX Transportation, Inc.*, 115 F.3d 860, 866 (11th Cir.1997).

As a result of the foregoing, Plaintiff's claims pursuant to a theory of hostile or abusive work environment are without merit. The Court finds no reasonable juror could find for Plaintiff on these claims, and Defendant's motion for summary judgment is ***GRANTED.***

**12.** The Confidential Climate Assessment Survey contained many comments bemoaning the treatment of white employees. Among these comments were the following:

"Managers discriminate against whites and Hispanics.

## III. PUBLIX IS ENTITLED TO SUMMARY JUDGMENT ON JOSEPH'S CLAIMS OF DISCRIMINATION RELATING TO HER REMOVAL FROM THE STOCK CLERK POSITION

The final claim is Joseph's allegation that her removal from the stock clerk position, and subsequent demotion to other positions in the store, was for a discriminatory purpose. At the outset the Court notes Joseph has presented *no* argument and proffered no evidence in support of her claims she was her demotion from stock clerk was due to considerations of race or national origin. Instead, she has focussed exclusively on her claim she was demoted as a result of her gender.

In support of this contention, Joseph puts forward two theories of recovery. First, she alleges that a single comment by her manager Brian Aten, at his deposition, in which he referred to the position as a "stockman position" constitutes *direct evidence* of Aten's discriminatory intent in removing her from the stock clerk position. Second, Joseph points to some statistical comparisons to show that females are under-represented as managers at Publix. Apparently, the reference to these statistics is an attempt to avail herself of either a "disparate impact" or "disparate treatment" theory of recovery.

To start, and for obvious reasons, the Court utterly rejects Plaintiff's attempts to characterize Mr. Aten's mere reference of the term "stockman" as direct evidence of discriminatory intent. As a result, the Court will only examine the claim for disparate impact/treatment.

a. **Disparate Impact:** "A disparate impact claim under Title VII charges that a facially neutral practice or test of the employer led to a discriminatory impact on a particular group and the test or practice cannot be justified as a business necessity." *Edwards v. Wallace Community College,* 49

"Managers seem to be scared about getting in trouble due to discrimination and are forgetting about the whites."
"I think there is a great deal of reverse discrimination concerning white people when it comes to promotions; blacks and Hispanics come first."

F.3d 1517, 1520 (11th Cir.1995). *See also Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). In order to prevail on a disparate impact case, it is not necessary to prove discriminatory intent, but the burden is on the Plaintiff to point to a particular practice or test that creates the disparate impact. *Edwards*, 49 F.3d at 1520. As well, the Plaintiff "must also make a comparison of the [gender] composition of persons in the labor pool" and show that the practice or test is connected to the statistical disparity. *Id.*

Joseph has not pointed to any test or practice employed by Publix which adversely affects either black employees, or employees of national origins other than the United States. Given this utter lack of evidence or argument in support, and to the extent Ms. Joseph is attempting to proceed under this theory of recovery, her claim is unavailing.

**b. Disparate Treatment:**[13] In order to bring a claim alleging disparate treatment in an employment decision, a Plaintiff must first make out a prima facie case as set out in the Supreme Court's decision *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the Plaintiff bears the initial burden of proving by a preponderance of the evidence, a prima facie case of discrimination.

A prima facie case of discrimination as set out in *McDonnell Douglas* requires a showing that (1) Plaintiff was a member of a protected class, (2) that she was qualified for the position held, (3) that she suffered an adverse employment decision, and (4) that she was replaced by a member outside of the protected class.

As noted before, Joseph is a member of a protected class. As well, this Court finds the removal from the stock clerk position constitutes an adverse employment decision. However, Joseph has produced no evidence she was either qualified for the job, or that she has been replaced by an employee outside the protected group.

The Court finds that Joseph has failed to prove, by a preponderance of the

evidence, that she was qualified for the position of stock clerk. During her one month tenure as a stock clerk, she was continually reprimanded for poor work performance. Ms. Joseph does not contest that she made a number of mistakes in holding the position. Instead, her sole complaint is that she was not given a chance to improve, and/or was not given the same chance as other stock clerks. However, Ms. Joseph has not produced any evidence that any other stock clerk at Store # 80 was treated any differently than she, or that stock clerks were given further training.

Ms. Joseph cannot show her position was filled by a non-minority. In this case, Brian Aten created the position for Ms. Joseph to allow her the opportunity to move into management. When Joseph failed at this opportunity, Aten merely reassigned her aisle to the other stock clerks.

In the end, Joseph has failed to establish a prima facie case of discrimination in the decision to remove her from her position as stock clerk. She has produced no legal theory by which she can sustain her claims, and summary judgment must be given for Defendant.

The Court also notes that in cases alleging disparate treatment, the Plaintiff "is required to prove discriminatory animus on the part of the Defendant." *Edwards*, 49 F.3d at 1520. Even if Ms. Joseph was capable of putting forth a prima facie case of disparate treatment, there is a complete failure of evidence on the issue of discriminatory intent. Ms. Joseph has never produced one piece of evidence to show either Brian Aten or Casey Suarez, the two managers responsible for her removal from stock, acted with discriminatory intent in removing her from the position. All evidence supports a finding she was removed from the job due to unsatisfactory work performance—without any evidence to support a finding of discriminatory intent, the Court *GRANTS* summary judgment on this claim.

---

**13.** To the extent Ms. Joseph may be arguing she was subjected to disparate treatment because she was subjected to a hostile work environment the

Court readopts the earlier finding that Publix may not be held liable under this theory.

## IV. PUBLIX IS ENTITLED TO SUMMARY JUDGMENT ON JOSEPH'S CLAIMS FOR RETALIATION

As noted above, Plaintiff, in her Complaint, alleges retaliation as a result of her filing of an EEOC complaint in June 1995. However, Plaintiff has not produced any evidence in support of this claim, and has chosen not to address the issue as raised in Publix's motion for summary judgment. As a result, the Court hereby **GRANTS** Publix's motion for summary judgment on this issue as well.

## V. ORDER UNDER SEAL

Pursuant to this Court's earlier *Order* (d.e.# 47) allowing Plaintiff to file her response under seal, the Court is sealing this *Order Granting Defendant's Motion for Summary Judgment.* However, the parties are *ORDERED TO SHOW CAUSE,* in writing, no later than 10 days from the date of this *Order* why this *Order* shall not be unsealed. Responses, if any, shall be delivered to chambers of the undersigned, and to opposing counsel, no later than 10 days from the date of this *Order.*