United States Court of Appeals,

Eleventh Circuit

No. 95-3364.

Arlene REYNOLDS, Plaintiff-Appellee, Cross-Appellant,

v.

CSX TRANSPORTATION, INC., A Virginia Corporation, Defendant-Appellee, Cross-Appellee,

Roger Widney, A Supervisory Employee of CSX Transportation, Inc., Defendant.

June 20, 1997.

Appeals from the United States District Court for the Middle District of Florida. (No. 93-1316-CIV-J-20), William Terrell Hodges, Judge.

Before COX, Circuit Judge, KRAVITCH, Senior Circuit Judge, and STAGG[*], Senior District Judge.

PER CURIAM:

Arlene Reynolds sued CSX Transportation, Inc. ("CSXT"), alleging claims of hostile environment sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1994); and hostile environment racial harassment and retaliation under 42 U.S.C. § 1981 (1994). The district court denied CSXT's motions for judgment as a matter of law and new trial. CSXT now appeals. We affirm in part, reverse in part, and vacate the judgment in part.

I. *BACKGROUND*

CSXT is a corporation with an office building in downtown Jacksonville, Florida. In a second floor room of that building, CSXT houses approximately 50,000 employee medical records containing sensitive information. From 1988 to 1993, CSXT used non-union temporary staffers to maintain those records. CSXT preferred such staffers over union-represented employees in part because of confidentiality concerns[1] and in part because of a freeze on promoting union-represented

---

[*]Honorable Tom Stagg, Senior U.S. District Judge for the Western District of Louisiana, sitting by designation.

[1]Dr. Joseph Thomasino, CSXT's Chief Medical Officer, testified that a breach of confidentiality would more likely occur if union-represented employees maintained the files

employees and putting them into entry-level staff jobs such as those available in the medical records room. Olsten Temporary Services ("Olsten Temporary") provided CSXT with at least some of the temporary staffers. Appellant Reynolds, Victoria Allen, and Darlene Turner, three black females, and Mindy Jennings, a white female, were among the staffers assigned to work in the medical records room.

*Events That Occurred Prior to Reynolds's Arrival*

Prior to 1992, Mike Rist, a white male and permanent CSXT employee, supervised the temporary staffers. Rist was replaced, however, in part because Jennings complained that Rist asked her to lunch under circumstances that she perceived as offensive. CSXT initially moved Rist to a file room located on the same floor as the medical records room, but later moved him to another floor. Susan Hamilton, the Assistant Vice President of Administrative Services, testified that this later move was due entirely to CSXT's decision to "stage him so that he could pull back on his union seniority." Jennings testified that the later move followed her expression of discomfort upon seeing Rist since her complaint was part of the reason for his demotion. Rist's replacement was Roger Widney, another white male and permanent CSXT employee. Widney reported to Les Backherms, the Manager of Administrative Services, who reported to Jim Duguid, the Director of Administrative Services.

After Widney began supervising the medical records room, Linda Elson, a manager in a different department, heard from a third person that Widney stated to Turner that her husband "must have left it in too long" in response to Turner's announcement that she was pregnant. Although Elson testified that she would have felt obligated to report any sexual harassment complaint to appropriate management employees, she did not investigate whether Widney actually made the statement since she considered the third person report "gossip."

*Events That Occurred Subsequent to Reynolds's Arrival*

Olsten Temporary assigned Reynolds to CSXT in February, 1992. Reynolds worked in CSXT's medical records room with the other temporary staffers—Allen, Turner, and Jennings—and

since those employees frequently moved in and out of job positions.

with Widney.

Within four or five weeks of her arrival at CSXT, Reynolds observed, or was subjected to, six instances of inappropriate behavior by Widney. On one occasion, Widney passed by her in a narrow shelving aisle and stated that they were stuck together "like magnets" when his front side touched her back side for a couple of seconds. Reynolds testified that she could feel his erection during the encounter. On another occasion, Widney looked at Reynolds and exclaimed that "there's [sic] other things that you can do on the top of a pool table" in response to Jennings's remark that her husband had stayed out all night with the excuse of playing pool. Reynolds testified that she interpreted Widney's exclamation as a suggestion that she engage in sexual intercourse with him. On another occasion, when Reynolds and Turner were looking for jobs in a newspaper, Widney stated that he had a job for them at a nude cafe in St. Augustine, and that he would go watch them there. When Reynolds asked Widney what his wife would think, Widney laughed. On another occasion, Reynolds overheard Widney ask Allen whether a certain swimsuit manufacturer made swimsuits large enough to fit Allen. Finally, on another occasion, Widney massaged Reynolds's shoulders, as he had the other temporary staffers. According to Widney, he did this in an effort to make them "feel good" about working there. Widney further testified that over his roughly 35-year tenure at CSXT, he had seen other CSXT male employees massaging their female subordinates' shoulders, in a manner expressing "compassion" for the stress they suffered.

Reynolds testified that she did not immediately complain about Widney's behavior. Although CSXT's anti-harassment policy was posted on bulletin boards located on all floors, she testified that she was not personally advised of those policies since she was a temporary staffer. She also testified that certain comments made by Widney gave her the impression that a complaint would be ineffectual. Reynolds testified that, for example, Widney would say "what goes on in the file room stays in the file room" and that if any complaints were made to his superiors, the superiors would back him up. Widney also stated from time to time something to the effect of "the first to complain will be the first to go."

*Reynolds's Initial Complaint & CSXT's Response*

Nonetheless, Reynolds did complain following an event which occurred in late March, 1992, about five weeks after she had arrived at CSXT. On that occasion, Widney approached Reynolds while she was kneeling down pulling files from a bottom shelf. As he neared, he asked Reynolds if she thought she was "down far enough," to which Reynolds replied, "as far as I can go." Thinking that perhaps Widney wanted to pass her in the shelving aisle, Reynolds then turned and sat on a step stool located next to her. When Widney's crotch was at the same level as Reynolds's face, Widney laughed and stated, "I'd better stop before someone come [sic] in and thinks something." Reynolds completed the task she was doing, then reported the event to Jay Jackson, an African Methodist Episcopal minister and a CSXT claims administrator who worked down the hall. Reynolds testified that Jackson took her complaint seriously and told her that he knew someone who could look into it.

Almost immediately, Jackson referred the complaint to Greg Lunn, an assistant manager in the Employee Relations Department. On the same day, Lunn met confidentially with Reynolds, Allen, and Turner and told them that he would refer the complaint to someone who would investigate it. Lunn then prepared a memorandum of the matter and submitted it to Elaine Tisdale, CSXT's Employee Relations Department Senior Director and the person in charge of investigating such matters. Within a few days of receiving the memorandum, Tisdale interviewed the temporary staffers individually. During Reynolds's interview, Reynolds reported several of the instances of inappropriate behavior by Widney. Tisdale asked each staffer how she could help, and the staffers told her that they wanted the behavior to stop. Per direction given by Hamilton, CSXT gave Widney a verbal warning, ordered him to attend sensitivity training, took away his supervisory duties, and ordered his transfer from the medical records room to the general claims file room, a place where he could work alone. That room was located on the second floor, down the hall from the medical records room. CSXT replaced Widney with Lana Brantley, a white female and permanent CSXT employee who Reynolds described as being "very nice" and "a good supervisor."

*Reynolds's Initial Replacement*

During a time when Widney was training Brantley for her new position, a doctor from

CSXT's Medical Department confronted Widney about a filing error. Widney testified that he believed Reynolds was to blame for the error. Prior to taking any action, he consulted Backherms about what to do. Backherms in turn discussed the matter with Duguid. After the three discussed the matter, Widney called Olsten Temporary and told it about the error. Olsten Temporary immediately replaced Reynolds with a different temporary staffer. Widney, Backherms, and Duguid all testified that at that time they did not know that Reynolds was the staffer who initially complained about Widney. However, Reynolds testified that when she went back to CSXT to collect her personal effects, she overheard Widney state to Jennings, "let me see if she's going to run upstairs on sexual harassment now."

*Reynolds's Return to CSXT*

Tisdale learned about Reynolds's replacement within days, and immediately left a message on Reynolds's answering machine telling her that she would get Reynolds her job back. Tisdale then met with Hamilton. Hamilton testified that she wanted Reynolds to come back because she was concerned about the appearance of impropriety that could be created by Reynolds's replacement. Within a few days, Olsten Temporary contacted Reynolds and told her that she could go back to CSXT if she wanted to. Reynolds accepted. She returned to CSXT after having missed less than one week of work. Because of Widney's part in having Reynolds replaced, Hamilton prepared a written reprimand for his personnel file and fined him five percent of his pay for six months. She also reprimanded Backherms and Duguid.

Reynolds testified that after she returned, Widney never again said anything to her or touched her inappropriately. However, she testified that he would look into the medical records room and stare at her while Brantley was there, would whistle in an irritating manner, and would bump into her while passing by her in the narrow aisles without excusing himself. On the first day of her direct examination, Reynolds testified that she reported this behavior to Tisdale on at least one occasion, but she could not remember exactly when she made such a report. Following an overnight recess, Reynolds returned to the stand and testified that she knew definitively that she told Tisdale about the behavior on two occasions, the first occasion being around May 14, 1994, very soon after her

return, and the second occasion being around September, 1994, soon after she filed a charge against CSXT with the Jacksonville Equal Opportunity Commission ("JEOC"). This testimony contradicted her earlier deposition testimony and Tisdale's testimony, both of which reflected that Reynolds told Tisdale about the behavior only once and only after she filed the JEOC charge. In any event, it is undisputed that CSXT took no further action against Widney until after Reynolds filed the JEOC charge.

*Reynolds's First JEOC Charge & CSXT's Second Investigation*

The JEOC charge specifically alleged that Widney continued to engage in inappropriate conduct. Tisdale testified that the charge prompted her to again investigate possible inappropriate behavior by Widney. As a result of the investigation, CSXT transferred Widney to a different floor, where a position had just become available. Hamilton testified that she felt that the move would eliminate any remaining awkwardness between the temporary staffers and Widney. Hamilton also testified that the investigation revealed that Olsten Temporary never paid Reynolds for the days she missed because of her replacement. CSXT therefore paid her for those days.

*Reynolds's Second Replacement*

Reynolds continued to work for CSXT until February, 1993, at which time CSXT replaced its medical records room non-union temporary staffers with CSXT permanent employees. According to Hamilton, this replacement was due in part to the fact that the replacement employees would otherwise lose their jobs or be furloughed and in part to the fact that the union was upset with CSXT's use of temporary staffers over CSXT permanent employees. Two of the replacement employees were white and two were black. Hamilton further testified that CSXT planned to relocate the temporary staffers to the real estate area, which was in need of more workers for a particular project.

*Reynolds's Second JEOC Charge & Complaint*

Within three weeks of leaving CSXT, Olsten Temporary assigned Reynolds to a position at an insurance company. Reynolds liked working there, in part because she had overtime compensation opportunities which she did not have at CSXT. While there, Reynolds filed a second

charge against CSXT with the JEOC, this time alleging that CSXT retaliated against her because of the first JEOC charge. The JEOC gave Reynolds a "right to sue" letter, and Reynolds filed the complaint involved in this case. In the complaint, she asserted hostile environment sexual harassment and retaliation claims under Title VII. She later amended the complaint to add hostile environment racial harassment and retaliation claims under § 1981.[2]

*Reynolds's Hostile Environment Racial Harassment Claim*

To support the hostile environment racial harassment claim at trial, Reynolds presented evidence that Widney made statements with racial undertones outside of her presence, but during her tenure at CSXT. For example, he used the words "salt and pepper" to refer to the white and black temporary staffers, and adopted the phrase "back of the bus" from Allen to refer to the location where Allen sat in the file room. Additionally, Widney testified that he felt more free to make comments with sexual innuendos around the temporary staffers, both white and black, since he saw them looking at a particular swimsuit catalog during work. However, he testified that he did not feel free to make the same comments around Brantley, the white female supervisor, even though she also looked at the catalog during work. According to Widney, he had known Brantley for a significant number of years and knew she was a "decent" woman. Reynolds also presented evidence that Widney stopped massaging the shoulders of Jennings, the white temporary staffer, upon her objection, but did not stop massaging the black staffers' shoulders upon their similar objections. Widney testified that if those women had objected, their objections had "gone over his head."

*The Trial*

After Reynolds's presentation of evidence and at the close of all evidence, CSXT moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). It argued that Reynolds had offered insufficient evidence to support her hostile environment, retaliation, and punitive damages claims. The district court denied the motion in all respects and submitted the case to the jury on special interrogatories. The jury found that (1) Reynolds was CSXT's employee and could recover on the statutory claims; (2) Reynolds was subject to a sexually and racially hostile working

---

[2]Reynolds also asserted claims against Widney. Those claims are not at issue in this appeal.

environment;  (3) CSXT knew or should have known of the harassment and failed to take prompt remedial action;  and (4) Reynolds suffered retaliation in both 1992 and 1993 for asserting harassment claims.  It awarded her $900 for lost wages due to retaliation, $600 for mental pain and suffering due to retaliation and a hostile environment, $167,000 in punitive damages for hostile environment sexual harassment, $167,000 in punitive damages for hostile environment racial harassment, and $166,000 in punitive damages for retaliation.  The district court *sua sponte* reduced the total award to $300,000, finding in part that the punitive damages award was excessive.  CSXT then moved for a new trial, and renewed its motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  The district court denied the motions and CSXT filed a notice of appeal.

## II. *STANDARD OF REVIEW*

We review de novo a district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court.  *See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 439 (11th Cir.1996).  Under those standards, we must view the evidence in the light most favorable to the nonmovant, and will reverse if "there is no legally sufficient evidentiary basis for a reasonable jury to find" for the nonmovant.  FED.R.CIV.P. 50(a);  *see Equitable Life Assur. Soc'y of the United States v. Studenic,* 77 F.3d 412, 415 (11th Cir.1996).  A " "mere scintilla of evidence' " is not legally sufficient.  *Walker v. NationsBank of Florida N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995) (quoting *Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989)).  We review the denial of a motion for a new trial for abuse of discretion.  *Wood v. Morbark Indus., Inc.,* 70 F.3d 1201, 1206 (11th Cir.1995).

## III. *ISSUES*

CSXT raises a number of issues, three of which we address below:  (1) whether Reynolds presented legally sufficient evidence to show that CSXT knew or should have known of harassment and failed to take prompt remedial action;  (2) whether Reynolds presented legally sufficient evidence to show that CSXT took adverse employment action against her in retaliation for her harassment complaints;  and (3) whether Reynolds presented legally sufficient evidence to show that

CSXT acted with the malice or recklessness required to justify a punitive damages award.[3]

## IV. *DISCUSSION*

### A. *Hostile Environment Claims*

To hold an employer directly liable[4] under either Title VII or § 1981 for a hostile environment created by a harassing supervisor, an employee must prove that the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Faragher v. City of Boca Raton,* 111 F.3d 1530, 1538 (11th Cir.1997) (en banc) (Title VII); *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1509 (11th Cir.1989) (§ 1981); *see also Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995) (holding that, similar to a hostile environment sexual harassment action under Title VII, an employer cannot be liable under § 1981 for hostile environment racial harassment unless the employer "knew or should have known" of the harassment and failed to take prompt remedial measures). The employee can show that the employer knew of or should have known of harassment by proving either that she complained to higher management of the problem or that the harassment was so pervasive as to infer constructive knowledge on the part of higher management. *Faragher,* 111 F.3d at 1538.

CSXT essentially concedes that it knew of harassment in the medical records room once Jackson reported Reynolds's complaint, but argues that Reynolds failed to present legally sufficient evidence to prove that it did not take prompt remedial action after receiving that report. Reynolds argues that she presented sufficient evidence to show that harassment at CSXT was so pervasive that CSXT should have known of harassment well before her arrival, and, therefore, it did not act "promptly" even though it acted immediately after she complained and within five weeks of her arrival. The only evidence that Reynolds points to for support of this argument is Widney's testimony that during his roughly 35-year tenure at CSXT, he had seen male supervisors massaging

---

[3]The disposition of these issues makes unnecessary discussion of the other issues raised by CSXT and the issues raised by Reynolds in her cross-appeal.

[4]Reynolds's hostile environment claims were based on direct, rather than indirect, liability. For a discussion of the difference between direct and indirect liability with regard to a hostile environment claim, *see Faragher v. City of Boca Raton,* 111 F.3d 1530, 1535-36 (11th Cir.1977) (en banc).

the shoulders of their female subordinates.[5] We conclude that a reasonable juror could not find that such random and unidentified instances of shoulder massaging over a large expanse of time constitute harassment so pervasive that CSXT should have known of harassment prior to Reynolds's arrival.[6]

Reynolds argues alternatively that even if she did not present sufficient evidence that CSXT should have known of a hostile environment prior to her arrival, she did present sufficient evidence to show that CSXT actually knew of a hostile environment at that time. She points to Elson's testimony that Elson heard a third-person remark that Widney made an inappropriate comment to Turner about Turner's pregnancy. We reject this argument since Reynolds presented no evidence to show that Elson was considered higher management within CSXT, or that Elson had a duty to report to higher management an off-hand third-person remark. *See Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996) (holding that hostile environment complaint to a manager not considered "higher management" does not suffice as direct notice to company).

CSXT, then, can only be directly liable for creating a hostile environment if Reynolds presented sufficient evidence to show that after CSXT received Jackson's report, it failed to take prompt "remedial" action;[7] that is, action " 'reasonably likely to prevent the misconduct from recurring.' " *Id.* (quoting *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)). " "What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial steps.' " *Garcia v. Elf Atochem North America,* 28 F.3d 446, 451 (5th Cir.1994) (quoting *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 479 (5th Cir.1989)).

In support of her contention that she presented sufficient evidence to show that CSXT failed

---

[5]Reynolds did not present any evidence that CSXT knew or should have known about racial harassment prior to her arrival at CSXT.

[6]Reynolds does not argue, and we do not find, that the evidence of shoulder massages combined with the evidence of Widney's inappropriate behavior within the medical records room is legally sufficient to show that harassment at CSXT was so pervasive that CSXT had constructive notice of a hostile environment prior to Reynolds's complaint.

[7]It is undisputed that CSXT took "prompt" action after it received Jackson's report.

to take "remedial action," Reynolds points to the evidence showing that even though CSXT conducted an investigation within days of her complaint, gave Widney a verbal warning, ordered him to attend sensitivity training, took away his supervisory powers, and transferred him to a file room where he would work alone, Widney still had access to the medical records room and used that access to stare at Reynolds and bump into her in the narrow aisles without excusing himself. She also points to the evidence showing that a previous same-floor transfer failed to remedy a different employee's feeling of discomfort upon seeing her alleged harasser.[8]

We conclude that this evidence, even viewed in the light most favorable to Reynolds, is legally insufficient to find that CSXT failed to take prompt "remedial" action. Reynolds herself testified that after CSXT took action against Widney, he never again said anything to her or touched her inappropriately. A reasonable juror could not find, as required by the hostile environment interrogatory, that the acts taken by CSXT, including immediate demotion, warning, transfer, and order to attend sensitivity training, did not constitute prompt action "reasonably likely to prevent the misconduct from recurring." Therefore, we conclude that the district court erred in denying CSXT's judgment as a matter of law as to the hostile environment claims.[9]

## B. *Retaliation Claims*

Title VII prohibits an employer from taking adverse employment action against an employee in retaliation for her opposition to discriminatory practices. 42 U.S.C. § 2000e-3(a).[10] To establish retaliation, an employee must show that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered adverse employment action; and (4) there was a

---

[8]Reynolds presented no evidence showing that the alleged harasser received other forms of discipline as had Widney, or that the alleged harasser continued to act inappropriately after the same-floor transfer.

[9]CSXT also contends that Reynolds failed to present sufficient evidence of a hostile working environment caused by sexual and racial harassment. We need not address this contention.

[10]In its entry of judgment, the district court noted that the damages awarded for retaliation could be based on either Title VII or § 1981. This court has not yet addressed the types of retaliation claims cognizable under § 1981 in light of the Civil Rights Act of 1991. Since the outcome of this appeal makes the bases for the retaliation claims immaterial, we assume the claims were based on Title VII alone and decline to address whether Reynolds's claims are of the type that are cognizable under § 1981 as amended.

causal connection between the protected activity and the adverse employment action. *See Little v. United Technologies,* 103 F.3d 956, 959 (11th Cir.1997).

Reynolds based her retaliation claims on two separate instances of alleged retaliation. The first occurred in April, 1992, when CSXT caused Olsten Temporary to replace her for one week. The second occurred in February, 1993, when CSXT replaced all of the temporary staffers in the medical records room with permanent CSXT employees. The jury specifically found that CSXT retaliated on both occasions. CSXT contends that Reynolds failed to present sufficient evidence to show that she suffered adverse employment action on either occasion or that there was a causal connection between her complaints and her replacements.[11]

As to the first instance of alleged retaliation, we disagree with CSXT's contention. Reynolds presented evidence showing that very soon after she complained of Widney's conduct, Widney met with his superiors about an alleged error made by Reynolds, then contacted Olsten Temporary about the alleged error. Immediately after this contact, Olsten Temporary replaced Reynolds with a different temporary staffer, resulting in Reynolds being out of work for almost a week and being unpaid for the absence until almost six months later. During that week, Widney commented that Reynolds could no longer complain about sexual harassment. This evidence provides a sufficient basis for a reasonable juror to decide that Reynolds's 1992 complaint and replacement were causally connected and that Reynolds suffered adverse employment action.

As to the second instance of alleged retaliation, we agree with CSXT's contention that Reynolds failed to present legally sufficient evidence to establish a causal connection between the two events. She presented no evidence from which a reasonable juror could infer that CSXT's replacement of all of its medical records room temporaries with permanent CSXT employees in February, 1993, was related to her March and September, 1992, complaints.

In computing compensatory damages, the jury did not specifically distinguish between the

---

[11]CSXT does not contend that Reynolds failed to offer sufficient evidence that the alleged retaliatory acts were condoned or directed by CSXT through higher management. *See Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (holding that employee's retaliation claim failed because, among other things, employee failed to establish that the alleged retaliatory acts were condoned or directed by the employer).

acts of retaliation for which it compensated Reynolds. The jury form merely stated that Reynolds should be compensated $900 in lost wages due to "retaliation" and $200 in mental pain and suffering due to "retaliation." A careful review of the record reflects that the $900 in lost wages necessarily was in compensation for the second act of alleged retaliation, since CSXT had already fully compensated Reynolds for her lost wages due to the first act of retaliation. Because Reynolds did not present sufficient evidence that the second act constituted retaliation, we vacate the judgment for the $900. The record also reflects that the $200 for mental pain and suffering necessarily was in compensation for the first act of alleged retaliation, since Reynolds presented no evidence that she was mentally harmed by the second act. Because Reynolds presented sufficient evidence that the first act constituted retaliation, we affirm the district court's denial of CSXT's judgment as a matter of law as to that claim and uphold the $200 award. We also affirm the district court's denial of CSXT's motion for a new trial as to that claim, finding no abuse of discretion.[12]

### C. *Punitive Damages Award*

Lastly, we must consider whether Reynolds's punitive damages award for retaliation can stand. To support a punitive damages award under Title VII, an employee must show that her employer acted with "malice or reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a. "Malice" means " 'an intent to harm' " and "recklessness" means " 'serious disregard for the consequences of [one's] actions.' " *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir.1996) (quoting *Canada v. Boyd Group, Inc.,* 809 F.Supp. 771, 781 (D.Nev.1992)).

The evidence in this case showed only that the acts that could plausibly be deemed "malicious" or "reckless" were solely acts of Widney, who was not considered part of CSXT's higher

---

[12]We reject CSXT's argument that Reynolds cannot recover under Title VII since she was technically employed by Olsten Temporary and not by CSXT. We have held that whether a defendant is an "employer" for Title VII purposes is based on the "economic realities" of the situation "viewed in light of the common law principles of agency and the right of the employer to control the employee." *Cobb v. Sun Papers, Inc.,* 673 F.2d 337, 341 (11th Cir.1982); *see also Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 611 F.Supp. 344, 349 (S.D.N.Y.1984) (holding that Title VII allows employee of temporary agency to recover from firm to where she was assigned as long as she can establish that the firm exercised sufficient control over the means and manner of the employee's performance or where the firm interfered with the terms and conditions of her employment with the agency). Reynolds produced legally sufficient evidence to show that CSXT was her employer for Title VII purposes.

management. Such evidence is insufficient to hold CSXT liable for punitive damages. *See id.* at 491-92 (holding that an employer will not be liable for punitive damages merely because a supervisor who is not part of "higher management" acted with the requisite "malice" or "reckless indifference"). Instead, Reynolds had to show that CSXT, through "higher management," countenanced or approved Widney's behavior. *Id.* at 491-92; *see also Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 943 (5th Cir.1996) (holding that punitive damages could not be assessed against a company that neither fostered nor ratified a harassing supervisor's behavior), *cert. denied,* --- U.S. ----, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997); *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 68 F.3d 1257, 1263 (10th Cir.1995) (same). Reynolds presented no such evidence. In fact, the evidence shows just the opposite: CSXT posted its anti-harassment policy on the bulletin boards located on all floors, took Reynolds's complaints seriously, immediately reprimanded Widney for the part he played in having Reynolds replaced, invited Reynolds back to work within one week of her replacement, and paid her for the days she missed because of the replacement.

Finding no evidence to support the jury's punitive damages award, we reverse the district court's denial of CSXT's motion for judgment as a matter of law as to the punitive damages claim.

## V. *CONCLUSION*

Denial of CSXT's motion for judgment as a matter of law as to the hostile environment claims is REVERSED and judgment in favor of CSXT is RENDERED as to those claims.

As to the retaliation claims: the judgment of $200 for mental pain and suffering is AFFIRMED; the judgment of $900 for lost wages is VACATED; denial of CSXT's motions for judgment as a matter of law and new trial is otherwise AFFIRMED; denial of CSXT's motion for judgment as a matter of law as to the punitive damages claim is REVERSED and judgment in favor of CSXT is RENDERED as to the punitive damages claim.

The effect of this mandate is to reduce the total judgment in favor of Reynolds to the principal amount of $200.