Matthew F. FOGG, Appellant,

v.

John D. ASHCROFT, Attorney General of the United States, Appellee.

No. 00–5138.

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 2001.

Decided June 22, 2001.

Frank J. Costello argued the cause for appellant. With him on the brief was Scott M. Zimmerman.

Alexander D. Shoaibi, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney at the time the brief was filed, and R. Craig Lawrence, Assistant U.S. Attorney.

Elaine R. Jones, Norman J. Chachkin and Charles S. Ralston were on the brief for amicus curiae NAACP Legal Defense and Educational Fund, Inc. in support of appellant.

Before: EDWARDS, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Matthew Fogg sued the United States Attorney General in federal district court, alleging that his employer, the United States Marshals Service, had discriminated against him on grounds of race in violation of § 717 of the 1964 Civil Rights Act as amended, 42 U.S.C. § 2000e–16. A jury, which under the 1991 amendments could

issue a binding verdict for violations on or after the amendments' effective date (November 11, 1991), found for Fogg and awarded a verdict of $4 million. It also found for Fogg on his pre–1991 claims, but as to those its verdict was purely advisory. See Fed.R.Civ.P. 39(c). Applying the statute's damage cap limitation, the district court cut the verdict to $300,000. It denied Fogg's claims for equitable relief as well as his claims of pre-November 11, 1991 violations. It also rejected Fogg's contention that the Merit Systems Protection Board ("MSPB") had unlawfully rejected the procedural "non-discrimination" claims that he raised in that forum.

Here Fogg's lead argument is that the district court misinterpreted the 1991 Civil Rights Act's compensatory damages cap; he contends that the cap applies to each successful "claim," whereas the district court found it to apply to each lawsuit. We reject Fogg's contention. We also affirm the court's judgment on the MSPB issue and on the pre–1991 allegations. We nevertheless reverse and remand because it appears that in denying Fogg's equitable claims the court did not recognize the issue-preclusive effects of the jury's verdict.

\* \* \*

Fogg, an African American, served as a Deputy U.S. Marshal in the District of Columbia from 1978 to his dismissal in 1995. In 1985, while he was serving in the fugitive detail in the federal district court here, the Marshals Service reprimanded him for allegedly misusing a government vehicle and transferred him to an assignment at the D.C. Superior Court. Fogg thereafter filed an administrative discrimination complaint. Fogg claims that both the reprimand and the transfer were the result of unlawful race discrimination and that the Marshals Service unlawfully delayed the processing of his administrative complaint.

In 1989 Fogg was assigned to a position on the Metropolitan Area Task Force, a multi-agency unit involved in tracking and apprehending dangerous fugitives. Fogg claims that from that time on the Marshals Service subjected him to a string of racially discriminatory and retaliatory acts. These, he alleged, included: (1) declining to give him his annual performance ratings for a two-year period beginning in April 1990; (2) passing him over in May 1990 for promotion from the GS–12 government salary level to GS–13; (3) refusing to give him further promotions after eventually elevating him to the GS–13 level; (4) stripping him of most of his supervisory responsibilities on the task force in January 1992; (5) inquiring about his EEO activities while he was on the job in 1993, leading Fogg to cease working because of severe stress; (6) ordering him back to work without a fitness-for-duty examination in November 1994, causing him to suffer further stress symptoms and to check into a hospital after less than a day back (after which Fogg never again returned to work); (7) returning him to the GS–12 level in December 1994; (8) demanding that he report for a fitness-for-duty examination in 1995; and (9) dismissing him in September 1995 for refusing to do so. Fogg also claims that he was subjected to a hostile work environment during the entire period at issue.

We address in turn the issues of the damage cap, the denial of equitable relief, the MSPB decision, and the pre–1991 allegations.

\* \* \*

### The § 1981a Damage Cap

The Civil Rights Act of 1991 amended Title VII to allow for conventional damages, as opposed to simply equitable relief (which in fact often took the form of monetary compensation, see, e.g., *Albemarle*

*Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (grant of back pay as exercise of equitable power)). The new provision states:

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

42 U.S.C. § 1981a(a)(1). Subsection (b) in turn subjects the new remedy to caps:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses ... shall not exceed, for each complaining party ... $300,000.

*Id.* § 1981a(b)(3). The size of the cap ranges in accordance with the size of the employer; the one applicable here ($300,000) is for the largest size of employer, one with more than 500 employees in each of 20 or more calendar weeks in a year. *Id.* at §§ 1981a(b)(3)(a)-(c).

■ The dispute in this case centers on the terms "in an action," as used in subsection (a)(1) and "each complaining party," as used in subsection (b). The district court interpreted these provisions to impose a $300,000 compensatory damage cap on the § 1981a recovery for Fogg's entire Title VII lawsuit. See *Fogg v. Reno,* No. 94-2814, at 1-5 (D.D.C. July 1, 1999) (Memorandum and Order) ("*July 1999 Order*"). Fogg argues, however, that the statute should be read to impose a cap on each claim. (He does not state how many claims he deems the lawsuit to have aggregated, nor does he identify the exact con-

tours of each claim.) As the issue is purely legal, we review de novo.

■ Three other circuits have faced the question before us, and all have found § 1981a to impose a cap on the recovery from each lawsuit, rejecting arguments that the controlling unit is the claim. See *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1245-46 (10th Cir.1999); *Smith v. Chicago School Reform Bd. of Trustees,* 165 F.3d 1142, 1149-50 (7th Cir.1999); *Hudson v. Reno,* 130 F.3d 1193, 1199-1201 (6th Cir.1997). In doing so, they focused on the word "action," noting that in common legal parlance, the term refers to a "civil or criminal judicial proceeding," BLACK'S LAW DICTIONARY at 28 (7th ed. 1999), or similarly, to "a lawsuit brought in court," BLACK'S LAW DICTIONARY at 18 (6th ed. 1991). See, e.g., *Hudson,* 130 F.3d at 1200. This also is the sense in which the Federal Rules of Civil Procedure define the term, describing as an "action" or "civil action" all claims for relief alleged in a single lawsuit. See Fed.R.Civ.P. 2-3.

Fogg does not, however, dispute the meaning of "action" itself. Rather, he argues that neither the word "action," nor the phrase "for each complaining party," speaks to the question at hand. According to him, the phrase "[i]n an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964" simply communicates that the damages cap applies to violations of these sections of the Act as opposed to other sections or other acts. The term "for each complaining party," Fogg adds, does not establish that there is a per lawsuit limit per party, but rather, that in multi-party lawsuits, the caps apply independently to each party. To prove his point, Fogg argues that if the statute *did* provide additional language identifying the relevant unit as either the lawsuit or the claim, then none of the disputed language would be redundant.

In essence, then, his argument is that none of the language on which courts and parties have focused is pertinent.

Fogg's argument on redundancy seems correct but immaterial. He is not claiming that the courts' construction of §§ 1981a(a)(1) & (b) violates some canon of statutory interpretation. And the application of canons to a differently worded statute tells us little about the one before us. It certainly does nothing to undermine the natural inference that by saying that "in an action brought under section 706 or 717" there is a damages cap of $300,000 "for each complaining party," Congress meant the cap to apply to each party in each lawsuit. Such a reading gives the words their "'ordinary, contemporary, common meaning,'" which is to prevail "absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

In an amicus brief, the NAACP Legal Defense Fund notes that in some contexts the term "action" can mean either a lawsuit or a "cause of action," citing some instances of judicial language allegedly using the phrases "cause of action" and "action" interchangeably. See, e.g., *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 884 n. 16 (D.C.Cir.1999) ("[A] *qui tam* suit under § 3730(b) is no less a *cause of action*, and the relator is no less a party prosecuting that *action*, because the *action* is brought in the name of the United States") (emphasis added). That "action" can serve as a synonym for "claim" in cases where the context makes that meaning inescapable does not itself establish that the term is ambiguous in other contexts.

To the extent that some ambiguity remains, this case proves not to be the sort where extra-textual sources point to a different interpretation. Fogg claims that the legislative history and policy considerations underlying the 1991 Civil Rights Act favor a per claim cap, but we find these sources unhelpful to his position.

The language at issue was introduced in the Danforth–Kennedy Substitute Civil Rights Act of 1991, S. 1745, 102d Cong. (1st Sess. 1991). Before the bill's passage, the Republican cosponsors submitted an interpretive memorandum stating that the "limitations ... are placed on the damages available to each individual complaining party for each cause of action brought under section 1981A." 137 Cong. Rec. 29,046/3 (Oct. 30, 1991). Nothing in the language or context, however, suggests that the sponsors' use of this phrase was intended to stake out a position on the proper unit for application of the cap.

Fogg also calls our attention to another interpretive memorandum, this one submitted by Congressman Edwards, a sponsor of the House version, observing that "[t]he sponsors acknowledge the limitations on damages awards in the legislation which apply to the damages available to each individual complaining party for each cause of action brought under section 1981A." 137 Cong. Rec. 30,662/1 (Nov. 7, 1991). But this apparent item of legislative history is in fact more like the oxymoron, "post-legislation legislative history." See *United States v. Carlton*, 512 U.S. 26, 39, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (Scalia, J., concurring). In an introductory statement the congressman states that he urges members of the House to vote for S. 1745, which the Senate had passed. 137 Cong. Rec. 30,661/1–2 (Nov. 7, 1991). But the exhortation was too late to have any such effect. The House in fact had voted to pass the bill earlier in the day (10 pages before, *id.* at 30,651). Indeed, Congressman Edwards may not have made his observations until several days later, for a note in the Congressional Record explains

that material appearing in the boldface type used for his introductory statement "indicates words inserted or appended, rather than spoken, by a Member of the House on the floor." *Id.* at 30,506. The statement could speak to the premises on which the statute passed, if at all, only to the extent it might have played a role in President Bush's decision to sign the bill—a proposition that isn't even argued. Accordingly, whatever its meaning, we can give the statement no material weight. See, e.g., *General Instrument Corp. v. FCC,* 213 F.3d 724, 733 (D.C.Cir.2000) (finding "almost no value" in post-enactment legislative observations).

Fogg's last point from the legislative history is that an earlier legislative proposal by President Bush had included a $150,000 cap for "harassment," S. 611, 102d Cong. (1st Sess. 1991), with explicit provision of the "practice" rather than the "incident" as the unit defining the cap. 137 Cong. Rec. 5679/1 (Mar. 12, 1991). Fogg's theory is that this bill reflected "a recognition of the per cause of action/per case ambiguity" and an effort to resolve it, and that it follows that the later triumph of the current language must be seen as a rejection of what he deems the President's per lawsuit approach. We fail to see the logic. Indeed, if Congress were in fact explicitly rejecting the earlier proposal in order to adopt a per claim approach, we cannot fathom why it would choose statutory language that seems to endorse the per lawsuit approach or, at the best from Fogg's perspective, is silent on the question.

█ Fogg also notes that the Equal Employment Opportunity Commission has previously argued in favor of a per claim interpretation of § 1981a and thus argues that under *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we

must defer to the its reasonable interpretation. Even assuming the language is ambiguous enough to get past *Chevron's* first step, and that the EEOC may be entitled to *Chevron* deference on these provisions, Fogg cites only an EEOC brief submitted to the court in *Reynolds v. CSX Transportation, Inc.,* 115 F.3d 860 (11th Cir.1997) (a case not in fact reaching the cap issue). The brief is obviously not the product either of formal adjudication or notice-and-comment rulemaking, and accordingly has no more status than the opinion letters, policy statements, agency manuals, and enforcement guidelines that the Court said were undeserving of such deference in *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). It is at best "entitled to respect," and only to the extent of its persuasiveness. *Id.* (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). As plaintiff gives us no reasoning from the brief, its persuasiveness, if any, has not been relayed to us.

Finally, Fogg argues that adoption of the per lawsuit interpretation defeats the policy purposes of the Civil Rights Act by encouraging plaintiffs to file multiple lawsuits where the allegations could well be combined into a single suit. But plaintiffs drawn to such a strategy will have to bear in mind the law of claim preclusion, which bars recovery in a second (or other) lawsuit for injuries inflicted in the same transaction as was adjudicated in the first lawsuit. See *Smith,* 165 F.3d at 1150–51. Indeed, plaintiff's argument highlights a further difficulty with his position. Allowing multiple caps in a single lawsuit would require the court in such a lawsuit to define the boundaries of the "claims" brought, an often vexing process. Here plaintiff offers neither a count of his "claims," nor statements of the contents of

each, nor even a general endorsement of using the transaction concept that governs in claim preclusion law.

*Equitable Relief*

▮ In addition to compensatory damages, Fogg also sought equitable relief in the form of front pay or reinstatement and expungement of his dismissal.[1] The district court denied this relief, and Fogg claims that the court committed legal error by ignoring the jury's binding factual findings regarding the post–1991 allegations.

▮ "[I]n cases involving allegations of intentional discrimination the district court must … follow the jury's factual findings with respect to a plaintiff's legal claims when later ruling on claims for equitable relief." *Kolstad v. American Dental Ass'n*, 108 F.3d 1431, 1440, *rev'd in part on other grounds*, 139 F.3d 958 (D.C.Cir.1998), *vacated and remanded*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). This rule has its roots in two legal principles. The law of issue preclusion gives binding effect to the first resolution of an issue (subject to certain limits), and the right to a jury trial usually demands that the jury bind the court, rather than vice versa. See *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472–73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); see also *Chauffeurs Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 579, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (Brennan J., concurring) (citing *Beacon Theatres* for collateral-estoppel effect of jury findings).

The jury found for Fogg on all the issues as to which its verdict is binding. It also responded to special interrogatories with findings that disparate treatment and/or retaliation motivated both the order requiring Fogg to report for a fitness-for-duty-examination in 1995 and Fogg's subsequent dismissal for refusing to obey that order. Yet the district court appears explicitly to have rejected those findings in deciding that equitable relief was not appropriate. The record indicates that the court declared from the bench that Fogg "was validly dismissed from the Marshals Service." Transcript of Proceedings, Feb. 25, 2000 at 9. In doing so, the court apparently gave priority to the MSPB decision, stating that "[I]f the Court of Appeals tells me that I have to disregard the decision of the Merit Protection Board, or that it is trumped by the jury's verdict, then we will revisit the issue." *Id.* at 11. The court also appears to have acknowledged that "the jury found otherwise," although it is unclear from the record whether the court was stating its own view or was simply finishing a sentence for Fogg's counsel. *Id.* at 9. On the other hand, the district court suggested the possibility of a reconciliation between its own findings and those of the jury, saying that he was "not sure that they are altogether inconsistent." *Id.* But the court never explained how the two sets of findings could be squared.

▮ Although the MSPB did conclude that Fogg's dismissal was not retaliatory, see *Fogg v. Dep't of Justice*, DC-0752-96-0101-I-2 (M.S.P.B. May 3, 1996) (hereinafter "*MSPB Decision*"), at 12–13, these findings are irrelevant to the extent they contradict the jury's Title VII findings. In "mixed cases" before the MSPB, the plaintiff enjoys a right to de novo trial of his or

---

1. The Supreme Court has recently affirmed the view of this circuit, see *Martini v. Federal Nat. Mortgage Ass'n*, 178 F.3d 1336, 1348–49 (D.C.Cir.1999), that front pay is not an element of "compensatory damages" within the meaning of 42 U.S.C. § 1981a and therefore not subject to the damages cap imposed by that section. See *Pollard v. E.I. du Pont de Nemours & Co.*, —— U.S. ——, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001).

her discrimination claims. See 5 U.S.C. § 7703(c); *Hayes v. U.S. Gov't Printing Office,* 684 F.2d 137, 140 (D.C.Cir.1982). Consistent with this principle, the court's separate decision upholding the MSPB determination quite correctly spoke only to the non-discrimination grounds of the decision. See *Fogg v. Reno,* No. 94–2814 (D.D.C. March 30, 1998).

Because it is unclear exactly what effect the court gave to the jury's findings, we remand the equitable claims to the district court so that it may reconsider the matter consistent with the law of issue preclusion. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." See RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1981); see also *Otherson v. Department of Justice, INS,* 711 F.2d 267, 273 (D.C.Cir.1983); 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE §§ 4416ff (1981).

*The MSPB Decision*

Fogg also challenges the district court's decision to uphold the MPSB ruling on his non-discrimination claims. He argues that the Marshals Service's order to Fogg to appear for a medical exam was *ultra vires* (and thereby, he argues, not requiring his obedience in the circumstances presented), and that the MSPB did not appropriately weigh mitigating factors in upholding the Service's dismissal for insubordination. Obviously this claim will be mooted if, on remand, the district court grants Fogg the equitable relief requested under Title VII. We review the MSPB claim, however, in case it is not fully mooted.

■ We first consider whether the MPSB incorrectly held that the fitness exam order was not *ultra vires*. Fogg claims that the order was defective because it didn't identify the specific duties to which the Marshals Service hoped to assign him in the event of a satisfactory medical exam. The MSPB held that no such requirement applied. The reasons it gave were wrong, but the decision was not only right but legally inevitable.

Under regulations implemented in 1984, the OPM did in fact require an agency to "identif[y] an assignment or position ... which it reasonably believes the employee can perform" before ordering a medical exam for an employee receiving worker's compensation for an on-the-job injury. 5 CFR § 339.301(b) (as quoted in *Medical Determinations Related to Employability,* 49 Fed. Reg. 1321, 1329 (Jan. 11, 1984)). But the version of the regulation applicable to Fogg's case (and currently in effect) makes no mention of this requirement: "An agency may require an employee who has applied for or is receiving continuation of pay or compensation as a result of an on-the-job injury or disease to report for an examination to determine medical limitations that may affect placement decisions." 5 CFR § 339.301(c).

In holding as it did, however, the MSPB relied not on the differences between the older and newer regulations, but rather on its earlier decision in *Abatecola v. Veterans Admin.,* 29 M.S.P.R. 601 (1986), which it characterized as having "expressly held ... that [having a particular position in mind] is not required." *MSPB Decision,* at 8–9. But *Abatecola* said nothing of the sort. Rather, it held that the agency *had* identified a specific assignment. 29 M.S.P.R. at 606.

■ In the face of such legal error, we would normally remand to the court for remand to the agency, but we do not do so when, as here, remand would be futile. "[O]nly one conclusion would be support-

able." *Donovan v. Stafford Construction Co.*, 732 F.2d 954, 961 (D.C.Cir.1984); see also *In re Sealed Case*, 237 F.3d 657, 667 (D.C.Cir.2001) (no deference afforded to agency interpretation of its regulation that is "plainly erroneous or inconsistent with the [regulation's] plain terms") (internal quotation omitted). Unlike the regulation considered in *Abatecola*, the current one imposes no job identification requirement at all. Thus the MSPB was correct in its ultimate conclusion.

We next consider whether the district court properly upheld the MSPB's finding that the Marshals Service's sanction, namely dismissal, was reasonable. We note at the outset that, absent legal error, our review is somewhat attenuated. The MSPB reviews federal employer disciplinary actions deferentially, to assess whether the employer agency "did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." *Douglas v. Veterans Admin.*, 5 MSPB 313, 332–333, 5 M.S.P.R. 280 (1981). And we review the MSPB's assessment deferentially, upsetting it only if it was arbitrary and capricious or an abuse of discretion, or if it was unsupported by substantial evidence. 5 U.S.C. § 7703(c). Although the district court reviews in the first instance in lieu of the Federal Circuit (because the case mixes discrimination and other claims, see *Barnes v. Small*, 840 F.2d 972, 978–79 (D.C.Cir.1988); *Hayes*, 684 F.2d at 140), its assessment drops out of the multiple layers of deference. See *Novicki v. Cook*, 946 F.2d 938, 941 (D.C.Cir.1991).

In assessing the reasonableness of employer-imposed sanctions, the MSPB has identified a non-exhaustive list of twelve factors relevant to appropriateness of the penalty. *Douglas*, 5 MSPB at 332, 5 M.S.P.R. 280. In upholding Fogg's termination, the Board found that the employer

had reasonably weighed Fogg's 19 years of good service without prior discipline against the seriousness of appellant's willful disobedience in thrice refusing to comply with the Marshals Service order despite knowing that such refusal was grounds for discipline. *MSPB Decision* at 14. In particular, the Board noted that previous MSPB decisions had found removal warranted for insubordination based on failure to undergo an ordered fitness-for-duty examination. *Id.* (citing *Reynolds v. Department of Justice*, 63 M.S.P.R. 189, 197 (1994); *Abatecola*, 29 M.S.P.R. at 611). In addition, it observed that law enforcement officers are held to a higher standard of discipline than other employees. *Id.* (citing *Jones v. Department of Army*, 52 M.S.P.R. 501, 506 (1992)).

Fogg does not dispute the accuracy of the MSPB's factual findings. Rather, he maintains that the Board did not give enough attention to the *Douglas* factors and should have applied them differently, giving more weight to Fogg's years of distinguished service and to his sincere belief that he was being discriminated against. He also argues that any heightened standard for law enforcement officers should not apply to someone who has been on sick leave for two and a half years.

Although the Board did not explicitly walk through each and every one of the *Douglas* factors, those factors are nonexhaustive and serve merely as guides to inform the core reasonableness assessment. *Douglas*, 5 MSPB at 332, 5 M.S.P.R. 280. In fact, in enumerating the factors the MSPB said that they would not all "be pertinent in every case." *Id.* Moreover, the analysis that the MSPB did undertake here appears to have covered the *Douglas* bases.

While Fogg's prolonged absence from work may slightly militate against applying the heightened duty for law en-

forcement officers, this possibility alone does not render the MSPB's decision unreasonable. *In the first place, the MSPB clearly thought Fogg's behavior highly reprehensible even absent his law enforcement duties. In addition, while there may be arguments for nuances based on such special circumstances, the Marshals Service might well think a uniformly heightened standard better instills in law enforcement officials the sense of "great trust and responsibility" essential to their jobs. *Crawford v. Department of Justice,* 45 M.S.P.R. 234, 237 (1990). Finally, any such nuance would be in some tension with the sixth *Douglas* factor—the interest in consistent treatment of "other employees for the same or similar offenses." 5 M.S.P.R. at 332, 5 M.S.P.B. 356. In any event, all these tradeoffs are for the employing agency's exercise of its reasonable discretion.

We affirm the district court's decision upholding the MSPB decision as to the non-discrimination allegations.

*The District Court's Findings With Respect to the Pre–1991 Claims*

In his final challenge, Fogg appeals the district court's finding that he had failed to prove by a preponderance of the evidence his pre–1991 Civil Rights Act claims. We review the district court's findings of fact for clear error. Fed.R.Civ.P. 52(a).

■ Fogg claims discrimination in his 1985 reprimand and transfer to a Superior Court position for having taken a government vehicle home with him while on two days' sick leave. At trial there was conflicting evidence as to whether there was a legitimate, non-discriminatory basis for Fogg's punishment. Fogg would have us rely on the testimony of one of his supervisors, Deputy Roche, who testified that he had authorized Fogg's use of the car. Although Roche admitted that he did not in fact know that Fogg was on sick leave

when the request was made, he also testified that Fogg had done nothing improper, because his fugitive-related duties required that he be able to respond at a moment's notice in the event of a prisoner escape. Deputy Roche and others also testified that Chief Deputy Hein, who actually delivered the reprimand, was quite harsh in his treatment of Fogg, severely reprimanding him in front of several supervisors. But U.S. Marshal Rutherford, who ordered Fogg's reprimand and transfer, testified that Fogg's use of the vehicle was indeed improper and that Fogg's treatment was relatively lenient given that the offense was punishable by termination. And Roche himself later qualified his earlier testimony, agreeing that government cars were not to be used on sick leave. Our review of the record yields no basis for concluding that the district court's resolution of any conflict was clear error.

■ Fogg similarly fails to demonstrate clear error in the other findings under review. He points to his failure to receive performance evaluations in 1990–91 (as well as 1992, but that is irrelevant to the pre–1991 assessment). Yet there was testimony at trial that the lack of evaluation resulted not from discrimination or retaliation, but rather from a misunderstanding between supervisors as to whether Fogg would be evaluated by his local district management or by his supervisor at the inter-agency task force. While Fogg claims that the Marshals Service discriminated against him in 1990 by promoting to a GS–13 vacancy a lower-ranked employee on the Service's merit certification list, the then Director, formerly U.S. Attorney in the Northern District of Florida, testified that he had developed a close personal and professional relationship with the other candidate when working in Florida, and that he promoted him on the basis of this experience. The district court

found that the Service had offered "superficially plausible" explanations, *July 1999 Order* at 6, and that Fogg had not provided evidence demonstrating these explanations to be pretextual, see *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc). Again we see no clear error.

There is some ambiguity regarding Fogg's pre–1991 hostile work environment claim. The district court appeared to have concluded that it was unnecessary to decide the question: "[T]he Court ... declines to makes its own finding with respect to the claim of hostile environment antedating 1991 as being unnecessary in light of the remittitur [referring to application of the $300,000 damages cap]." *July 1999 Order*, at 1–2. On the other hand, it is not inconceivable that the court's footnote 7, *id.* at 6 n. 7, generally rejecting the view of the jury for the pre-November 11, 1991 period, applies to the hostile environment claim as well as to more specific allegations.

On appeal Fogg assumes the court rejected his claim, and asserts clear error. If the district court actually declined to resolve the issue, that declination may have been error, but it is not an error asserted by plaintiff and therefore not before us. See generally *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983). Accepting instead the parties' evidently shared assumption that the district court rejected the hostile environment claim, we find no indication of clear error.

Similarly we find no error in the court's rejection of Fogg's claim that the Marshals Service unlawfully delayed the processing of his Title VII complaint. We assume arguendo that such delay can constitute a Title VII violation, but cf. *Ward v. E.E.O.C.*, 719 F.2d 311, 312–314 (9th Cir. 1983); *Stewart v. E.E.O.C.*, 611 F.2d 679, (7th Cir.1979); *Georator Corp. v. E.E.O.C.*, 592 F.2d 765, 769 (4th Cir.1979), but find

no clear error in the court's factual determination.

\* \* \*

We reverse so that the district court can reconsider plaintiff's claims for equitable relief in light of a correct understanding of the issue preclusive effect of the jury's verdict. In all other respects the judgment is affirmed.

*So ordered.*