**Linda BOYD, Plaintiff,**

v.

**Paul H. O'NEILL, Secretary of the Treasury, et al., Defendants.**

**No. CIV.A.01–1818 (RMC).**

United States District Court, District of Columbia.

March 6, 2003.

June Dorothy Kalijarvi, Margaret E. Johnson, Michelle L. Perry, Kalijarvi, Chuzi & Newman, P.C., Washington, DC, Joel Paul Bennett, Washington, DC, for Plaintiff.

Heather Jean Kelly, Whiteford, Taylor & Preston, L.L.P., Washington, DC, Mark E. Nagle, Diane Marie Sullivan, U.S. Attorney's Office, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

COLLYER, District Judge.

Pending before the court is Paul O'Neill, the Internal Revenue Service ("IRS"), and Joel E. Helke's (collectively, "defendants") motion to dismiss Counts V and VI of the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for reconsideration of the court's order denying their motion to substitute the United States for Mr. Helke. For the following reasons, the court denies the motion to dismiss and grants the motion for reconsideration.

## I. BACKGROUND

Plaintiff Linda Boyd is a trial attorney in the Field Services division of the Financial Institutions and Products branch of the IRS, where she has been employed since July 6, 1998. At that time, her immediate supervisor was Mr. Helke, who held the title of branch chief. Ms. Boyd alleges that, from July of 1998 through June of 1999, Mr. Helke repeatedly subjected her to unwanted physical contacts of a sexual nature because of her gender, as well as offensive sexually-suggestive and gender-based comments. Specifically, Ms. Boyd avers that Mr. Helke backed her up to a wall or filing cabinet and touched her shoulders on three separate occasions, backed her up to a wall or filing cabinet without touching her on four other occasions, and blocked the doors of a Washington Metropolitan Area Transit Authority ("Metro") train at the Federal Triangle station. *See* Amended Complaint ¶¶ 18–19, 21–23, 25, 27, 64. Ms. Boyd also avers that Mr. Helke yelled at her twice, used the term "doing it" in a sexually-provocative manner, used double entendre statements (i.e., "can't get it up today" when attempting to open a computer program), and scratched his groin area on a few occasions in front of her and others. *See id.* ¶¶ 21, 26, 42, 48.

In her lawsuit, Ms. Boyd asserts claims for sexual and gender-based harassment against Mr. O'Neill, in his official capacity as Secretary of the Treasury, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Counts I and II), and claims for intentional infliction of emotional distress and assault against Mr. Helke (Counts V and VI).[1] On December 31, 2001, the defendants filed a motion to substitute the United States for Mr. Helke and then to dismiss the tort claims against the United States. The defendants argued that the United States should be substituted for Mr. Helke under the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("FELRTCA"), Pub.L. No. 100–694, 102 Stat. 4563 (1988), because he was acting within the scope of his employment at the time of the alleged incidents out of which the tort claims arose. Upon substitution, the defendants continued, Ms. Boyd's tort claims should be dismissed (against the United States) under the Federal Tort Claims Act, 28

---

**1.** Ms. Boyd also asserts claims of retaliation under Title VII and violations of the Privacy Act (Counts III and IV), which are not relevant to the instant motion.

U.S.C. § 2671 *et seq.* The court denied this motion on September 28, 2002.

The defendants filed the instant motion on October 11, 2002, asking the court to dismiss Ms. Boyd's tort claims against Mr. Helke on different grounds or, alternatively, to reconsider its September 28th order. The defendants now argue that Title VII bars Ms. Boyd's tort claims because that statute is the exclusive remedy for claims of discrimination against federal officials in the federal workplace. They argue that the conduct underlying these tort claims is the same as that underlying her harassment and retaliation claims under Title VII. According to the defendants, the two sets of claims are "essentially co-extensive." Defendants' Motion to Dismiss in Part or, in the Alternative, Motion for Reconsideration at 5. Ms. Boyd contends that, although Title VII may preclude a federal employee from bringing claims under other federal legislation, it does not prevent her from bringing tort claims under the common law of the District of Columbia. The defendants reply that, because Title VII has been amended to include compensatory damages in addition to equitable relief, the rationale for allowing common law tort claims based on sexual or gender-based harassment has been eliminated.

In support of their motion for reconsideration of the September 28th order, the defendants assert that Ms. Boyd failed to sustain her burden of proving that Mr. Helke was not acting within the scope of his employment when the alleged incidents in question took place.[2] They maintain that Ms. Boyd has not produced facts sufficient to rebut the certification of the Attorney General that Mr. Helke was acting within the scope of his employment. Ms. Boyd counters that Mr. Helke's alleged physical contacts with her—the primary basis for her tort claims—were not authorized by the Treasury Department and, therefore, were beyond the scope of his employment.

## II. ANALYSIS

### A. Motion to Dismiss Counts V and VI

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must accept as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff; however, the court does not need to accept as true the plaintiff's legal conclusions. *See Alexis v. District of Columbia,* 44 F.Supp.2d 331, 336–37 (D.D.C.1999).

The defendants argue that Counts V and VI should be dismissed because Title VII preempts other remedies, including relief sought under common law tort theories. They ground their argument primarily in the Supreme Court's decision in *Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), which held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id.* at 835, 96 S.Ct. 1961. *Brown,* however, does not preclude a federal employee from

---

**2.** At a hearing on this issue on January 14, 2003, the court ordered each of the parties, by January 24, 2003, to submit a three-page supplemental brief addressing the applicability of the cases cited by the opposing party in that party's brief(s). The defendants submitted a timely brief, but it was over seven pages long. Ms. Boyd submitted a three-page brief, but it was filed four days late. Accordingly, the court strikes both of these supplemental briefs. The parties are advised to comply fully with any future orders issued by the court.

bringing common law claims of intentional infliction of emotional distress and assault against her supervisor based on conduct that also happens to be discriminatory. As persuasively decided by Judge Norma Holloway Johnson of this court, *Brown* is inapplicable to common law tort claims against a federal employee in his individual capacity because

> *Brown*'s discussion of the exclusivity of remedies for federal employees is limited to the exclusivity of *federal* remedies for employment discrimination. A review of the nature of the plaintiff's allegations in *Brown* demonstrates that the plaintiff did not attempt to redress his discrimination claims through a state tort claim for damages directed at federal officials in their individual capacities.

*Epps v. Ripley*, No. 81–588, 1982 WL 514, at *1 (D.D.C. Mar. 11, 1982) (emphasis in original).

■ While the Supreme Court in *Brown* prevented the plaintiff from suing the General Services Administration for employment discrimination under section 1981, it did not address the issue of whether a federal employee may sue both the government under Title VII and an individual under common law tort theories based on the same facts. Assault, for example, is actionable apart from Title VII because it is beyond the meaning of discrimination. *See Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir.1995). Such a highly personal violation does not fall within Title VII's domain, even if arising from the same facts as a claim of discrimination. As the Ninth Circuit remarked in *Brock*, "[r]ape *can be* a form of sexual discrimination, but we cannot say to its victims that it is nothing more." *Id.* at 1423 (emphasis in original). When, as here, the victim of a discriminatory act alleges a harm apart from discrimination, Title VII does not preclude her from suing under a common law tort

theory to remedy that distinct injury. *See id.*

■ To the extent that a federal employee's claim of intentional infliction of emotional distress is based on alleged assaultive conduct, rather than the alleged harassment, it is also not precluded by Title VII. Any emotional injuries arising from the alleged harassment are subsumed within Title VII, but a plaintiff may pursue her intentional infliction of emotional distress claim for injuries resulting from alleged tortious behavior. *See Stewart v. Thomas*, 538 F.Supp. 891, 895–97 (D.D.C. 1982) (The plaintiff based her claims on "two distinct and independent rights: her right to be free from discriminatory treatment at her jobsite and her right to be free from bodily or emotional injury caused by another person.").

The defendants ask the court to disregard the holding in *Stewart* because that case was decided prior to 1991, when Congress amended Title VII to include compensatory and punitive damages. *See* 42 U.S.C.1981a(b). They contend that giving Ms. Boyd the opportunity to recover damages under both Title VII and common law tort theories based on the same conduct may lead to "double recovery." Defendants' Reply Brief at 2. This argument, however, misunderstands the scope of section 1981a and the purpose of tort claims.

Although section 1981a generally allows a Title VII plaintiff to receive compensatory and punitive damages, that recovery is limited. A Title VII plaintiff, for example, may not recover punitive damages against "a government, government agency or political subdivision[.]" 42 U.S.C. § 1981a(b)(1). Consequently, both Mr. O'Neill, in his official capacity as Secretary of the Treasury, and the IRS are exempt from being ordered to pay punitive damages if Ms. Boyd proves her Title VII claims. *See Ernesto v. Rubin*, No. 97–

4683, 1999 U.S. Dist. LEXIS 21501, at *44 (D.N.J. August 31, 1999) ("[A]ny claim for punitive damages against a government agency or the head of the agency is barred."). Compensatory damages are also limited under Title VII. Section 1981a(b)(3) caps the amount of compensatory damages a plaintiff may receive based on the number of people the defendant employs. In any event, the total amount may not exceed $300,000, regardless of the number of claims made in a particular lawsuit. *See Fogg v. Ashcroft,* 254 F.3d 103, 106 (D.C.Cir.2001).

In addition to the fact that tort claims provide a federal employee with potential damages relief beyond what she could obtain under Title VII alone, allowing her to recover under both sets of claims hardly amounts to "double recovery" because each seeks to remedy a different wrong. Title VII exists to redress employment discrimination, while common law tort theories aim to amend personal injuries. It is not "double recovery" to be compensated twice based on one set of conduct if that conduct resulted in two distinct types of harm.

### B. Motion for Reconsideration

 Although Title VII does not preempt common law tort claims for intentional infliction of emotional distress and assault, Mr. Helke may be immune from these claims under the FELRTCA if the actions alleged in the amended complaint were within the scope of his employment. In 1988, Congress amended the Federal Tort Claims Act to provide for the substitution of the United States as the sole defendant when a federal employee is sued for common law tort claims arising out of actions taken within the scope of his employment. *See* 28 U.S.C. § 2679(d)(1). The FELRTCA empowers the Attorney General to certify that a federal employee's conduct occurred within the scope of his employment. *See id.*

This certification is not conclusive, however, and a federal court examines the issue independently. *See Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). Once the Attorney General makes a certification, the plaintiff bears the burden of producing evidence that the defendant was acting outside the scope of his employment. *See Kimbro v. Velten,* 30 F.3d 1501, 1509 (D.C.Cir.1994); *Wright v. United States,* No. 95–0274, 1996 U.S. Dist. LEXIS 21781, at *8 (D.D.C. Feb. 8, 1996).

On September 26, 2001, the Attorney General's designee certified that Mr. Helke was acting within the scope of his employment at the time of the incidents alleged in the amended complaint. The court, nonetheless, denied the defendants' earlier motion to substitute the United States for Mr. Helke. Believing this to be in error, the defendants now ask the court to reconsider its ruling on this matter.

 The scope of employment of a federal employee is an issue of state tort law; therefore, the law of the District of Columbia applies here. *See Haddon v. United States,* 68 F.3d 1420, 1423 (1995) (citing *Kimbro,* 30 F.3d at 1506). The D.C. Circuit in *Haddon* noted that the District of Columbia Court of Appeals looks to the Restatement (Second) of Agency when determining whether an employee acted within the scope of his employment. The Restatement provides that the

> [c]onduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1). Conduct must be "of the same general nature as that authorized" or "incidental to the conduct authorized" to be within the scope of employment. *Id.* § 229. For conduct to be "incidental" it must be foreseeable, meaning that it is a "direct outgrowth" of the performance of an employee's instructions or job assignment. *See Haddon,* 68 F.3d at 1424.

Ms. Boyd's claim for intentional infliction of emotional distress is based on Mr. Helke's alleged physical contacts with her and his alleged assaults on her. *See* Plaintiff's Opposition Brief at 7–8. She cites three instances of alleged touchings by Mr. Helke in her amended complaint. The first alleged incident occurred in late-September to early-October of 1998. During that time, Ms. Boyd alleges that Mr. Helke backed her up against a filing cabinet, stood very close to her, placed his hands on her shoulders to hold her in place, and whispered that he did not like what had happened between her and another attorney in the branch and that he hoped it would not happen again. *See* Amended Complaint ¶ 18. A second incident occurred in late-November of 1998, when Mr. Helke allegedly backed Ms. Boyd up against a wall in a corridor, stood with his nose almost touching her nose, put his hands on her shoulders, and whispered that he wondered how things were going. *See id.* ¶ 22. The final alleged incident of physical contact occurred in late-February of 1999. While discussing his edits to a letter drafted by Ms. Boyd, Mr. Helke allegedly backed her up against a wall in his office, stood with his nose almost touching her nose, placed his hands on her shoulders, and laughed. *See id.* ¶ 27.

Ms. Boyd's claim for assault, in turn, is based on the same and similar alleged conduct. *See* Plaintiff's Opposition Brief at 8. Apart from the purported physical contact, she contends that, in mid-October of 1998, Mr. Helke accosted her in a hall-way, backed her up against a wall, and wagged his finger at her. He also allegedly made statements to her at this time "regarding the fact that she was on probation, that he did her evaluation and that she should not discuss this outside of the branch." *Id.* ¶ 19. On a separate occasion in mid-November of 1998, while in his office with the door closed, Mr. Helke allegedly yelled at Ms. Boyd, angrily telling her that she was on probation and that she should do what he said. Moreover, he allegedly backed her up against a wall and stood nose to nose with her, laughing when Ms. Boyd asked him to move. *See id.* ¶ 21. A similar occurrence allegedly took place approximately two weeks later, when Mr. Helke came into Ms. Boyd's office to discuss her work interactions with another employee. Ms. Boyd asserts that Mr. Helke backed her up against a filing cabinet and told her that he hoped she would do what the other employee had requested. *See id.* ¶ 23. In mid-January of 1999, Ms. Boyd alleges that Mr. Helke came into her office to discuss a document production on which she was working. He then allegedly backed her up to a filing cabinet, stood only one or two inches from her, and told her, "the next time the production will go more smoothly, won't it." *Id.* ¶ 25 (quoting Mr. Helke). In addition, sometime in February or March of 1999, Mr. Helke allegedly yelled at Ms. Helke regarding a draft letter that he had returned to her for revisions on several occasions. *See id.* ¶ 26.

### 1. Alleged Physical Contacts

 Under the law of the District of Columbia, Mr. Helke's physical contacts with Ms. Boyd, if proven, would constitute an outgrowth of his authorized duties as her supervisor and, accordingly, would be within the scope of his employment. It was clearly part of his job function and in furtherance of the IRS's business for him to discuss Ms. Boyd's interactions with another lawyer in the branch, to ask how

she was doing, and to evaluate her work product. Touching Ms. Boyd's shoulders under these circumstances was incidental to Mr. Helke's role as branch chief, occurring during job-related discourse. In addition, these alleged incidents happened at work and there is no evidence that they took place after business hours. Finally, the fact that Mr. Helke touched Ms. Boyd's shoulders on three occasions could not have been unexpected by the IRS in view of his supervisory relationship with her.

Ms. Boyd cites two cases for the proposition that Mr. Helke's alleged physical contact with her was outside the scope of his employment. The first case is *Williams v. Morgan,* 723 F.Supp. 1532 (D.D.C.1989). There, Guy Morgan, a supervisor at the Department of Agriculture, struck Phyllis Williams, a fellow employee, on the back with some papers and/or file folders. While recoiling from the strike, Ms. Williams injured her back. She then sued Mr. Morgan for assault and battery on her. Mr. Morgan moved the court to substitute the United States as the defendant under the FELRTCA after the Attorney General twice had refused to certify the same. In accordance with District of Columbia law, the court examined section 228 of the Restatement (Second) of Agency to determine whether Mr. Morgan was acting within the scope of his employment when the incident occurred. It found that Mr. Morgan's conduct was beyond the scope of his employment because "[i]t is seldom necessary ... that an official of the Federal Grain Inspection Service, U.S. Department of Agriculture, must lay violent hands upon a subordinate in the performance of his duties." *Id.* at 1535.

Ms. Boyd also directs the court to *McKinney v. Whitfield,* 736 F.2d 766 (D.C.Cir.1984). In that case, Iris McKinney was in the office of Charles Whitfield, her second-line supervisor in the Federal Aviation Administration, to sign a letter regarding a personnel action. On her way out, the letter dropped to the floor. Mr. Whitfield ordered Ms. McKinney to pick up the letter, but she did not. Instead, she fled to her office with Mr. Whitfield following her. Once Mr. Whitfield reached Ms. McKinney's office, he either fired or threatened to fire her. She then attempted to leave her office to discuss the matter with Mr. Whitfield's supervisor. Mr. Whitfield, however, told her that she was "not going anywhere" and allegedly pushed a chair into her leg. *Id.* at 767 (apparently quoting Ms. McKinney's Answers to Mr. Whitfield's Interrogatories). When she continued to try to leave, Mr. Whitfield allegedly gripped and twisted her arm. In the lawsuit, Mr. Whitfield argued to the district court that he was entitled to absolute immunity for his alleged actions because they occurred "within the outer perimeter of his authority." *Id.* The district court dismissed the case for that reason and Ms. McKinney appealed the judgment. The D.C. Circuit reversed, holding that "federal bureaucrats exceed the outer perimeters of their responsibilities, and act manifestly beyond their line of duty, when they resort to physical force to compel the obedience of their managerial subordinates." *Id.* at 771–72.

These two cases are distinguishable from the case at hand. In *Williams,* Mr. Morgan's tortious conduct did not directly arise from any of his job-related duties. The parties conceded that he was "engaging in some early morning horseplay" when he struck Ms. Williams. *Williams,* 723 F.Supp. at 1534. Mr. Morgan's deposition transcript reveals that he was not performing any supervisory tasks at the time of the physical contact. *See id.* Moreover, there is no indication whatsoever that his action was committed to further the Department of Agriculture's business purposes.

*McKinney* also differs from the situation here. That case predates the FELRTCA and involved a very similar, but not identical, issue. The D.C. Circuit examined, as a condition for a federal employee to receive immunity from tort claims, whether that employee's conduct was within the outer perimeter of his authority. Determining a federal employee's *scope of employment* under District of Columbia law for purposes of the FELRTCA, in contrast, requires consideration of the factors listed in the Restatement (Second) of Agency pursuant to decisions of the District of Columbia Court of Appeals, which the D.C. Circuit did not do in *McKinney* because of that case's different circumstances. *See Haddon v. United States,* 68 F.3d 1420, 1423 (D.C.Cir.1995). More importantly, the *McKinney* court dealt with much more serious physical contacts than Mr. Helke's alleged actions. The D.C. Circuit noted in its opinion that some physical contacts may be within the outer perimeters of an employee's authority, just not the ones in that case. *See McKinney,* 736 F.2d at 772 n. 22.

The District of Columbia Court of Appeals's holding in *Weinberg v. Johnson,* 518 A.2d 985 (D.C.1986), appropriately governs this lawsuit and the court follows its dictate. In that case, Ezeal Boyd worked at a laundromat cleaning the premises and emptying washing machines. On the day in question, Thomas Johnson put shirts in one of the washing machines and left for home. He returned less than an hour later to find the shirts missing. Mr. Boyd informed him that he did not know where the shirts were. Mr. Johnson left and returned twice in an attempt to find his shirts. During the last encounter, he had a conversation with Mr. Boyd about the shirts that culminated in Mr. Johnson saying, "forget it," and turning to leave. *See Johnson v. Weinberg,* 434 A.2d 404, 406 (D.C.1981) (quoting Mr. Johnson). At that point, Mr. Boyd called out to Mr. Johnson and then shot him in the face. The court of appeals held that the owner of the laundromat could be liable for Mr. Boyd's conduct under the Restatement (Second) of Agency. It reversed the trial court's directed verdict that Mr. Boyd's conduct was outside the scope of his employment, stating that the "assault arose out of the transaction which initially brought Johnson to the premises (to launder shirts) and was triggered by a dispute over the conduct of the employer's business (missing shirt)." *Id.* at 409. It also explained that an employer is liable for its employee's conduct, even if not explicitly authorized, "where a tort is the outgrowth of a job-related controversy[.]" *Id.* at 408.

A careful reading of the two appellate decisions in *Weinberg* leads the court to conclude that Mr. Helke's alleged physical contacts with Ms. Boyd were within the scope of his employment under the law of the District of Columbia. *Weinberg* emphasized—among the Restatement (Second) of Agency's other factors—whether the tort arose from the employee's duties, even though the tort itself was not authorized. Here, each of the three alleged touchings occurred while Mr. Helke was performing his supervisory responsibilities over Ms. Boyd and were not so extreme as to be outside the bounds of foreseeable conduct.[3] As discussed above, these al-

**3.** Although the court believes that these actions, if proven, would be highly objectionable, this fact alone does not render them outside the scope of Mr. Helke's employment. The court's ruling on this matter should not be interpreted to mean that Ms. Boyd's tort claims are without merit and would not form the basis for damages against a non-government tortfeasor; rather, it is simply the implementation of a congressional policy decision that a federal employee should be immune for

leged actions also satisfy the other factors in the Restatement (Second) of Agency.

### 2. Alleged Assaults

 Ms. Boyd contends that Mr. Helke's alleged assaults on her were outside the scope of his employment only because they "were so intertwined with his batteries of her." Plaintiff's Opposition Brief at 8. She argues that Mr. Helke's alleged physical contacts taken together with the alleged assaults operated to elevate the latter outside the scope of his employment. Since the three alleged incidents in which Mr. Helke touched Ms. Boyd's shoulders have been found to be within the scope of his employment, this argument fails.

Even analyzed independently, the alleged assaults were within the scope of Mr. Helke's employment. The alleged conduct happened at work[4] and was not so extreme or unusual as to be unexpected by the IRS. It also concerned Ms. Boyd's performance at her job—including her probationary status and the chain of command within the branch, her interactions with another employee, a document production on which she was working, and revisions to a letter—and appeared to be intended to further the IRS's business purposes.

### III. CONCLUSION

For these reasons, the court denies the defendants' motion to dismiss Counts V and VI on the ground that Ms. Boyd's exclusive remedy is Title VII. The court grants the defendants' motion for reconsideration of the September 28th order and

substitutes the United States for Mr. Helke as the defendant for Counts V and VI. A separate order will accompany this memorandum opinion.

---

all tortious conduct taken by him within the scope of his employment.

4. Ms. Boyd's allegation of assault at the Metro station obviously did not occur at work. *See* Amended Complaint ¶ 64. In her Opposition Brief, however, Ms. Boyd does not argue or attempt to produce evidence showing that this specific alleged encounter was outside the

scope of Mr. Helke's employment. Therefore, the court relies on Ms. Boyd's generic argument—that the alleged assaults were outside the scope of Mr. Helke's employment because they were "teamed with *actual* physical coercion"—for determining the status of this alleged incident. Plaintiff's Opposition Brief at 9.